UNITED STATES of America,
Appellee,

v.

William BENTVENA et al., Defendants-
Appellants.

No. 27733.

United States Court of Appeals
Second Circuit.

Argued Jan. 30, 1963.

Decided June 13, 1963.

Jerome Lewis, Brooklyn, N. Y., for appellants, Bentvena, Carmine Panico, Salvatore Panico and Struzzieri.

Harris B. Steinberg, New York City, (Edward J. Bloustein, New York City, of counsel), for appellant, Di Pietro.

Nathan Kestnbaum, New York City, for appellant, Fernandez.

O. John Rogge, New York City, and Frances Kahn, New York City, for appellant, Galante.

Abraham Glasser, New York City, for appellants, Loicano (Sylvester Cosentino, New York City, on the brief), and Sciremammano (George Todaro, New York City, on the brief).

Constantine N. Katsoris, New York City, for appellant, Mancino.

William R. Luney, New York City, for appellant, Mirra.

Richard V. Giordano, New York City, for appellant, Monastersky.

Jacob Kossman, Philadelphia, Penn., and Albert J. Krieger, New York City, for appellant, Ormento.

Jonathan L. Rosner and Arthur I. Rosett, Asst. U. S. Attys. (Robert M. Morgenthau, U. S. Atty., for the Southern Dist. of New York, William M. Tendy and Arnold N. Enker, Asst. U. S. Attys., on the brief), for appellee.

Before MOORE, SMITH and HAYS, Circuit Judges.

MOORE, Circuit Judge.

This is an appeal by thirteen defendants from their convictions for violations of the federal narcotics laws, 21 U.S.C. §§ 173, 174. The indictment, filed on May 5, 1960, contained eight counts, and named twenty-nine defendants. Counts one through seven charged various defendants with substantive violations; count eight charged all of those named with conspiracy to violate the narcotics law. The trial from which this appeal is prosecuted was the second trial on this indictment. The first trial, before Judge Levet and a jury, ended in the declaration of a mistrial after a trial of six months.

This retrial of fourteen of the defendants began before Judge MacMahon and a jury on April 2, 1962, on counts four and five, charging sales of narcotic drugs, and count eight charging a conspiracy to import and distribute drugs.[1] On June 19, 1962, the trial court granted a motion for judgment of acquittal as to the defendant, Frank Mari, and on June 25, 1962, the jury returned a verdict of guilty as to the thirteen appellants

---

1. Count four named Orlandino, Struzzieri and Monastersky; count five named Monastersky, Bentvena and Struzzieri. Orlandino pleaded guilty at the beginning of the first trial. All appellants were named in count eight.

on all counts in which they were named. Sentencing took place on July 10, 1962.[2]

Appellants, together with their co-defendants and co-conspirators, were charged with a conspiracy to import large amounts of narcotic drugs into the United States from Canada, and to dilute and distribute these drugs after their importation. The principal government witness, Edward Lawton Smith, and other government witnesses, described in some detail the workings of the conspiracy and the functional division of labor within the organization. In skeleton outline the conspiracy consisted of a group of Canadians, headed by Guiseppe "Pepe" Cotroni, who handled the exportation of the drugs from Canada. Couriers brought the narcotics across the Canadian-United States border and into the New York metropolitan area. Members of the conspiracy manned centers in the New York metropolitan area where they received the drugs from the couriers and diluted and packaged them. Distributors finally disposed of the drugs through various selling outlets. Overall responsibility for the continuing operation rested in its "chief executive", the appellant Carmine Galante.

## THE CONSPIRACY

### The April 1957 Montreal Meeting and Narcotics Importation

In late April 1957, Smith, a Canadian with underworld connections, met the appellant Mancino in Montreal. Mancino asked Smith to make a "run" into New York with him and Smith agreed. The following day Mancino took Smith to an apartment in Montreal where they met the appellant Galante, the severed defendants Giglio and Stepanoff, and Frank Cotroni, Vic Cotroni, and a person identified only as "Angelo". Galante picked up a valise, put it on the coffee table, and opened it. Mancino examined its contents, which were clear plastic bags containing a white powder. As Smith and Mancino were leaving with the valise, they encountered the severed defendants, Guiseppe "Pepe" Cotroni and Vecchio. Smith and Mancino drove to New York to Frank's Bar & Grill in Brooklyn where Mancino took the valise of narcotics and Smith returned to Montreal.

In late February or early March, 1958, Smith again came into New York City and drove to Frank's Bar & Grill where he met Mancino, Vecchio, and "Angelo". Mancino asked Smith if he would drive over to Manhattan and back. Smith agreed and Mancino picked up a package from Vecchio's car and directed Smith to the Vivere, a bar located on the lower east side. There Mancino left the car, rejoined Smith shortly, and they drove back to Brooklyn.

### The "Route" Deliveries

During the ensuing months, Smith spoke with Mancino almost daily and there followed at weekly intervals a series of at least five "route" deliveries of narcotics throughout the Metropolitan area. On each of these occasions Smith met Mancino, Vecchio and "Angelo" at Frank's Bar & Grill in Brooklyn. Vecchio would remove a cardboard suitbox from the trunk of his car and give it to Mancino who would take it upstairs to his apartment and return in a few minutes carrying a valise. Prior to one "route" delivery, Smith accompanied Mancino to the latter's apartment with the suitbox and saw the nature of its contents, cellophane bags containing white powder. On this occasion, Smith saw Mancino wrap each of the bags in brown wrapping paper and mark them

---

2. The following sentences were imposed: Bentvena—15 years on counts 5 and 8; DiPietro—20 years; Fernandez—35 years; Galante—20 years and $20,000; Loicano—20 years; Mancino—20 years; Mirra—20 years; Monastersky—30 years on counts 4, 5 and 8; Ormento—40 years and $20,000; Carmine Panico—12 years; Salvatore Panico—20 years; Sciremammano—12 years; Struzzieri—12 years on counts 4, 5 and 8. The sentences imposed on multiple counts are to run concurrently. Fernandez, Monastersky, and Ormento were sentenced as multiple offenders pursuant to 26 U.S.C. § 7237(c).

with the names of the "drops" along the route. Mancino then put the packages in a valise and an empty shoebox and he and Smith embarked on their route.

The first stop on the route was the Vivere. After the first delivery to the Vivere, Smith accompanied Mancino into the bar, where he observed Mancino put the valise on the table, take out a package and give it to DiPietro, who in turn gave it to the severed defendant Gellman.

The second stop on the run was the Squeez-Inn, a bar on East 4th Street in Manhattan. On at least three occasions, the package was given to appellant Sciremammano who carried it to the back of the bar. Another time the shoebox containing the narcotics was given to the defendant Polizanno[3] in the presence of the severed Canadian defendant Stepanoff.

The fourth stop[4] was the 1717 Club, a bar in Brooklyn operated by appellants Salvatore and Carmine Panico. There the package would be delivered to one of the brothers, both of whom would take it to the kitchen in the back of the bar.

After the stop at the 1717 Club, Smith would return with Mancino to Frank's Bar & Grill, where Smith would remain while Mancino made a delivery to "Rocco up on the Hill". Mancino later introduced the severed defendant Sancinella to Smith as "Rocco up on the Hill", and the appellant Angelo Loicano as "his partner, Puggy". In Loicano's presence, Sancinella asked Smith to make some runs from Canada for them. When Smith declined this offer, Loicano told him that he could make $100,000 to $140,000 a year in this work and that Smith should think it over.

In addition to these regular stops on the route, on three occasions Smith drove Mancino to a Manhattan hotel where packages were given to the severed defendant Indiviglio.

*DiPietro and Mancino meet Cotroni in Canada*

Because of a dispute over DiPietro's failure to make prompt payment in full to the Canadian group, DiPietro, late in April 1958, invited Smith to accompany him on a trip to Canada. A day or two later, Smith, DiPietro, Mancino, "Angelo," and one Frank Randazzo drove to Canada. In Montreal, Smith arranged a meeting between Cotroni, Giglio and DiPietro. After DiPietro paid Cotroni $17,000, Giglio informed DiPietro that he was now on a "pay as you go basis." On the following evening, Mancino, Randazzo, "Angelo" and Smith drove back to New York City with a load of narcotics and Smith and Mancino made deliveries to the Vivere, the Squeez-Inn, the hotel in Coney Island, and the 1717 Club.

*The Ormento Group*

Between May 16 and May 21, 1958, at the Vivere, DiPietro introduced Smith to appellant Anthony Mirra. On the following evening at Mirra's request, Smith went to Johnny's Keyboard, a bar on Lexington Avenue between 56th and 57th Streets and there met Mirra, the severed defendant Petillo, and appellant Joseph Fernandez. During the next few days, the four of them spent a great deal of time together. In late May 1958, Smith and Petillo drove to the lower east side to Jay's Bar on Houston Street, where Petillo introduced Smith to three men—"Angie", "Bootsie" and "Chalutz" —the severed defendants Angelo Tuminaro, Anthony DiPasqua and Charles Gagliadatto, respectively. During the meeting, "Angie" asked Smith to make "runs" from Canada for them and when Smith declined "Angie" guaranteed that he would make $140,000 a year in this line.

A few days later, Mirra and Smith went to a restaurant, Marino's, where they met appellant John Ormento, who also asked why Smith was turning down "these offers we have been making to

---

3. Polizanno was severed between the first and second trials.

4. The third stop was a hotel in Coney Island. None of the persons there involved are defendants in this indictment.

you." In the early part of June, Smith again went to Jay's Bar with Petillo, where they met "Bootsie", "Angie" and "Chalutz." "Angie" again pressed him to make runs from Canada and when refused asked him about the trip he had made to Canada with DiPietro, and asked whether he had brought back a "load." When Smith agreed that he had done so, "Angie" said, "Who the hell do you think that was for?" As Smith and Petillo started to leave, Petillo picked up an envelope which he said "was his end" that he received every week.

A short time later, Mirra told Smith to go to Chickie James' Stable, a midtown night club operated by Mirra. There he was joined by Mirra and Fernandez. Mirra and Fernandez went to the rear of Fernandez's car where Fernandez took out an attache case which he gave to Mirra. Smith drove Mirra to the Saxony Restaurant on East 53rd Street. As Mirra was getting out of the car, Smith asked what this was all about and Mirra opened the attache case revealing two cellophane bags containing a white powder, and said they were "making a run." When Mirra returned, he again opened up the case and showed Smith the contents, two bundles of money. They returned to the Stable where they met Fernandez and Petillo. Mirra gave the attache case to Petillo, who left the area in a taxicab.

During the second week in June, 1958, Smith and Mirra made a delivery of narcotics to Marconi's Restaurant at Ormento's behest. Sometime during the middle of June, Smith, Mirra, Petillo and Fernandez met in the basement of Chickie James' Stable and discussed the possibility of opening a new wholesale narcotics outlet. They concluded that with Smith's Canadian connection for narcotics, they could establish themselves and parted with the understanding that when all was set they would let Smith know. About a week later, Smith met with "Bootsie", "Angie", "Chalutz" and Petillo at Jay's Bar and was again urged to make trips to Canada for them.

### Delivery from Galante to Ormento

Late in June 1958, Mirra, Smith and one Joseph Curtis drove to 56th Street and Sutton Place in Manhattan where Galante was standing on a corner. When they approached, Galante told Mirra that the "stuff" was in a nearby car. Mirra and Smith removed a suitcase from the rear of the car and Mirra gave it to Curtis, who put it in his car. Galante asked Mirra if he knew what to do, Mirra indicated that he did, and Galante gave Smith ten $100 bills. Mirra, Smith and Curtis then drove to the Park Sheraton Hotel, where Smith and Mirra went upstairs. In one of the rooms they met Ormento and Vinnie Bruno, not a defendant in this case. Mirra threw the suitcase on the bed and Ormento opened it, revealing a number of cellophane bags with white powder.

On the 28th or 29th of June, Mirra, Petillo and Smith were arrested by local authorities. Upon their release, Smith was criticized by Mirra for not changing hotels and when Smith remained adamant, Mirra told him to make a change or he'd wind up behind a truck, because "if Carmine [Galante] gives the order, John [Ormento] will have to carry it out, and you are going to wind up being dragged behind the truck."

### Seizures of Heroin and Other Evidence

On February 14, 1959, Narcotics Agents observed Marcantonio Orlandino drive to the residence of his brother and sister-in-law, Ann and Philip Orlandino. He entered the house and came out carrying a brown paper bag and drove to his place of employment in Jamaica. Shortly after noon he drove to the Railway Express Office in Jamaica and presented a parcel for shipment to "Eula I. Brown in Chicago", giving his name as Smith. The package arrived in Chicago, and on February 18 it was seized by agents of the Bureau of Narcotics. It contained approximately two kilograms of heroin.

Again on February 14, 1959, Narcotics Agents, together with local police, entered the residence of Ann and Philip

Orlandino and found approximately seventeen pounds of heroin, over $49,000 in cash, and paraphernalia utilized in the diluting, packaging and distribution of drugs. At the same time, other agents seized two packages which contained approximately a half kilogram of heroin from the desk used by Marcantonio Orlandino at his place of employment. Further out on Long Island, at the same time, other agents entered the residence of Marcantonio Orlandino and seized, *inter alia*, an address book in which appeared the inscription: "Ang Tumanaro 95–24 148 St. Ca 6–7518 Jamaica OL. 7–5476".

In April 1959 other law enforcement officers were closing in on the center at the Vivere Lounge operated by DiPietro and Gellman. On April 27, Narcotics Agents followed Gellman to 19th Street and Second Avenue where he met DiPietro in a luncheonette. While there an agent overheard their conversation concerning an imminent sale of narcotics. DiPietro instructed Gellman to meet him "in front of the plant in exactly ten minutes." The agent followed Gellman to 226 East 18th Street where Gellman entered the building. When he came out he was carrying a brown paper bag which he gave to DiPietro who was waiting in front of the building. They parted and DiPietro entered a car which was parked across the street from the luncheonette, and drove away. They met again a short time later and DiPietro was seen to hand Gellman some money.

On April 30 Gellman again entered the "plant" and emerged carrying a brown paper bag. He was apprehended by federal and state officers. The bag he was carrying contained a quantity of heroin. A search of the apartment at 226 East 18th Street, which was used as the plant, uncovered a suitcase containing a quantity of heroin, packaging paraphernalia, and some empty plastic bags with traces of heroin.

*Agent Biase and Smith as "Importers" and "Retailers"*

In the middle of April 1959 Smith started to cooperate with the Bureau of Narcotics and, shortly thereafter, he introduced an undercover agent of the Bureau, Patrick Biase, to Mancino in an attempt to infiltrate the conspiracy. The Agent and Mancino discussed the possibility of Smith's and the Agent's opening a new wholesale outlet for narcotics, securing narcotics from the Cotroni organization in Canada. On April 27 Biase and Smith met Mancino and were told by Mancino that he had not yet gotten the "connection" they sought to take care of supplying them with drugs during a shortage between Canadian trips but said that he would see "Rocco" (Sancinella) about it. They parted with the understanding that Smith and the Agent would contact him upon their return from Canada.

Smith and Biase went to Canada and, on April 29, met "Pepe" Cotroni and the severed defendant Rene Robert. Smith told them that he and Biase were going to open a new wholesale outlet and wanted their aid. Cotroni gave them detailed instructions on the methods used to smuggle the narcotics across the Canadian-United States border. He also asked Smith how "Angie" and "Bootsie" were. He told Smith that the narcotics seized from the Orlandinos belonged to "Bootsie" and "Angelo".

On May 21 Biase and Smith returned to Montreal and were reminded by Cotroni that it was his "stuff" that had been seized—"the ten kilos in Hicksville from Orlandino." He told them that "Angie" and "Bootsie" still owed him a substantial amount of money for the narcotics seized from Orlandino, but that he was not concerned since he could trust them. They remained in Montreal and on May 25 Cotroni told Biase and Smith that he had gotten a phone call from the people in New York and that "Angie" and "Bootsie" were not anxious for new competition. They agreed to avoid this problem by telling Mancino that they had a new connection for drugs in Florida. After arranging to communicate with Cotroni by telephone, Smith and Biase returned to New York where they met Mancino and, according

to their plan with Cotroni, told him they were going to get the narcotics from a Florida connection.

On June 3, 1959, Biase and Smith returned to Montreal and met Cotroni and Robert. Biase gave Cotroni $13,800 for narcotics. Cotroni gave the money to Robert, who left the motel room, returning a short while later with two kilograms of heroin. Biase and Smith turned the narcotics over to agents of the Bureau of Narcotics and the Royal Canadian Mounted Police.

After several telephone calls from Cotroni, Smith and Biase returned to Montreal on June 17. Once again Cotroni and Robert met them at their motel and Biase gave $14,000 to Cotroni who promised delivery of the drugs later that evening. In the early hours of June 18, while Cotroni, Biase and Smith were in the motel room, Robert entered carrying a cardboard box and a brown zipper bag which Biase had furnished. They contained approximately four kilograms of heroin. Cotroni opened the cardboard box and took out one of the plastic bags containing heroin, and indicated to Biase and Smith a point on the bag which had been punctured and then sealed with scotch tape. He told how this mark was made by him in his particular testing procedure and that it was a trademark, attesting that Cotroni himself had tested the narcotics and had found them to meet his high standards of purity. Cotroni said, "when you see that 'X' on the tape there, you'll know that the stuff belongs to me." After separating, Biase and Smith again turned the narcotics over to agents of the Bureau of Narcotics and the Royal Canadian Mounted Police.

A week later on June 24 Cotroni came to New York City with Robert and met Smith at the Edison Hotel. Smith introduced another undercover agent, Frank Dolce, as the "money man" of their business. After the meeting, Dolce and Smith drove Cotroni to the Vivere to find DiPietro. He was not there and Cotroni asked them to drop him at Mancino's residence in Brooklyn. The next day Smith and Dolce again met Cotroni

and Dolce paid him part of some money due him for narcotics. Cotroni later told Smith that he wanted him "to bring back 12 kilos for Boots and Angie." On June 30 in Montreal Robert again advised Smith that Cotroni intended to utilize him to bring drugs back to New York City for the people there. On July 7, Biase and Smith met Cotroni and Robert to arrange for a purchase. While driving around Montreal, Cotroni told them that he had six kilograms for them, and, if everything was all right, they would also take another fifteen kilograms to New York for Tuminaro and DiPasqua. Thereafter, difficulties in consummating the transaction arose and officers of the Royal Canadian Mounted Police placed Cotroni and Robert under arrest.

Sometime during July or August, 1959, shortly after Cotroni's arrest, Mirra and Indiviglio, accompanied by another man, arrived at the Montreal residence of Suzanne Cadieux, Rene Robert's mistress. They sought the "cache" of drugs Cotroni had at the time he was arrested. After threatening Mlle. Cadieux to no avail, they departed without finding the narcotics.

*Sufficiency of Proof as to the Conspiracy*

■■ There was abundant evidence that all appellants, except Bentvena, Monastersky and Struzzieri, were part of a conspiracy to import and deliver narcotic drugs. The evidence of knowing participation in the conspiracy by Galante, Mancino, DiPietro and Mirra is overwhelming. The testimony of Smith not only placed Galante in the midst of the group importing the drugs but also shows him with physical possession of narcotics and direct knowledge and supervision of the importation. Smith's and Agent Biase's testimony establishes Mancino as a courier for the organization who smuggled the drugs into the United States and, with Smith, distributed the drugs on periodic "route" deliveries to wholesale centers in the New York metropolitan area. DiPietro was described as the head of the center that operated from the Vivere. There

was extensive testimony relating to DiPietro's trip to Montreal and the settlement of his financial difficulties with Cotroni. Smith's testimony concerning DiPietro was corroborated by substantial independent evidence. It was DiPietro who introduced Smith to Mirra. Mirra was a member of the group operating under Ormento in the east midtown area and was responsible for the physical handling of the narcotics for this group. Smith's testimony showed Mirra delivering narcotics from Galante to Ormento whom Mirra described as his "boss." Smith accompanied Mirra on a number of narcotics deliveries. Mirra's position in the organization was corroborated by the testimony of Cadieux.

Ormento contends that he was involved in "but two isolated transactions" with "no evidence of any narcotics or indeed of any possession of narcotics." However, on the occasion of the delivery of narcotics by Mirra to Ormento at the Park Sheraton Hotel, Mirra threw the suitcase on the bed and Ormento opened it, revealing a number of cellophane bags containing white powder. Galante had previously characterized the contents of the suitcase as "stuff". That the substance involved in this transaction was narcotics may, of course, be proved by circumstantial evidence. The evidence establishing the nature of the contents of the packages here involved was in all respects similar to that approved by this court in United States v. Agueci, 310 F.2d 817 (2d Cir. 1962). See, also, United States v. Morello, 250 F.2d 631 (2d Cir. 1957); Toliver v. United States, 224 F.2d 742 (9th Cir. 1955). Ormento is in no position to invoke the isolated transaction rule. Aside from the evidence of Ormento's direct participation in this and the other narcotics transaction referred to previously, his statements to Smith concerning the latter's refusal to accept the several offers made to him clearly support an inference of knowledge of the existence of a vast organization dealing in Canadian narcotics.

Fernandez and Loicano similarly argue that the evidence against them is insufficient to establish knowing participation in a vast conspiracy and, at best, shows an isolated transaction. The isolated transaction rule

"is not an arbitrary rule which is to be applied rigidly and without reason. It has been utilized to exonerate a defendant only when there is no independent evidence tending to prove that the defendant had some knowledge of the broader conspiracy and when the single transaction is not in itself one from which such knowledge might be inferred." United States v. Agueci, supra, 310 F.2d at 836,

The evidence against Fernandez consisted first of his taking an attache case from his car and giving it to Mirra who delivered it to the Saxony Restaurant. This attache case contained two cellophane bags filled with white powder. Smith also testified that Fernandez had summoned Mirra and Petillo to a meeting called by Galante at Johnny's Keyboard. Finally, Smith testified that Fernandez took part in a discussion with Mirra, Petillo, and Smith concerning the importation and distribution of Canadian narcotics. At this meeting, Smith was asked if he had a strong connection with "Pepe" Cotroni and if he could get narcotics from him. When Smith replied affirmatively, Petillo indicated that the other three could get the money that was needed and that they could open a new wholesale narcotics outlet.

A single act may be enough to draw a defendant within the ambit of a conspiracy. United States v. Aviles, 274 F.2d 179 (2d Cir. 1959), cert. denied, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960); United States v. Carminati, 247 F.2d 640 (2d Cir.), cert. denied, 355 U.S. 883, 78 S.Ct. 150, 2 L.Ed.2d 113 (1957). Since, however, the crime of conspiracy requires an intent to participate in the unlawful enterprise, the single act must be such that one may reasonably infer from it such an intent

or the government must submit independent evidence that the defendant knew of the conspiracy and associated himself with it. United States v. Aviles, supra; United States v. Reina, 242 F. 2d 302 (2d Cir.), cert. denied, 354 U.S. 913, 77 S.Ct. 1294, 1 L.Ed.2d 1427 (1957); United States v. Koch, 113 F.2d 982 (2d Cir. 1940). We find here, as we did in United States v. Agueci, supra, that there was independent evidence from which Fernandez' knowledge of, and desire to participate in, the overall conspiracy may be inferred. The conference at which the opening of a new wholesale outlet being supplied from Canada was discussed demonstrates Fernandez' knowledge of the existing conspiracy and his desire to participate in a new phase of that conspiracy. Appellant's contention that this discussion related to the formation of a new conspiracy and not a new participation in the old is not well founded. A conspiracy, once established, is presumed to continue until the contrary is demonstrated, United States v. Stromberg, 268 F.2d 256 (2d Cir.), cert. denied, 361 U. S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102, (1955), and cases cited therein. Further, a conspiracy of this kind is, by its very nature, constantly expanding. The outlet contemplated at this meeting would have become just one more "drop" in the scheme of distribution. In any event, the contemplated formation of a new outlet presupposes the existence of old ones and is sufficiently probative of Fernandez' knowledge of the overall conspiracy to warrant a conviction for conspiracy. As we said in United States v. Aviles, supra, 274 F.2d at 190:

"From evidence of knowledge of the conspiracy and a transaction with one of its members it would be reasonable to infer intent to participate in it."

Loicano was introduced to Smith as a "partner" of "Rocco, up on the hill" (Sancinella) in Sancinella's presence. At this meeting at a bar in Brooklyn, Sancinella asked Smith if he would be willing to "make some runs back and forth to Canada for him and his partner Puggy (Loicano)." When Smith declined the offer, it was Loicano who suggested that he could make $100,000 to $140,000 a year as a courier and told Smith to think it over. Smith testified that a number of deliveries were made to Sancinella. Loicano contends that the conversation with Smith was not in furtherance of the conspiracy charged but was an attempt to form a new conspiracy. We disagree. Sancinella and Loicano were engaged in an effort to recruit Smith as a courier to carry narcotics from Canada. They sought to have him join the existing conspiracy as an integral part of it and not to go into competition with the old conspiracy. This is made abundantly clear by Mancino's efforts on behalf of Sancinella and Loicano to employ Smith. Mancino was the strong thread running through this entire conspiracy. This evidence against Loicano demonstrates the requisite knowledge of the conspiracy and a transaction with its members from which it would be reasonable to infer an intent to participate in it.

Carmine and Salvatore Panico and Sciremammano also contend that there is insufficient evidence to establish their knowing participation in the conspiracy. The evidence showed that these three appellants were repeated recipients of packages on Mancino's route deliveries. While no conversations with Sciremammano illuminate his actions in repeatedly receiving packages of narcotics from Mancino and taking them to the back of the bar, this receipt of a quantity of narcotics repeated at least three times, is sufficient evidence from which a jury might reasonably conclude that the participant was aware of the existence of a larger scheme.

Like Sciremammano, the Panicos were recipients of packages of drugs at their "place of business," the 1717 Club, but unlike Sciremammano, their activities were amplified by conversations, as well as evidence of acts which clarify their knowledge of the conspiracy. Smith testified that Salvatore Panico was waiting on the sidewalk for Mancino and Smith on a number of occasions that packages

of narcotics were delivered to the 1717 Club. From this evidence it might be inferred that he was there by pre-arrangement, with knowledge of the existence of a larger scheme in which he was participating. His actions in removing one of the packages from the valise in Smith's car on one delivery, and his admonition not to argue while they had "stuff" supports the inference. Carmine Panico participated in the receipt of the package from Mancino on each occasion and accompanied his brother into the kitchen with it. In addition, he told Smith and Mancino to do their "arguing some other place, some other time, not when you're making a run." The evidence as to his own independent actions and statements fully supports the jury's conclusion that he knowingly participated in the overall scheme.

### THE ERRORS ASSERTED

There remain for consideration those claims of error which affect all or several of the appellants.

### I

#### A. *The Atmosphere of the Trial.*

All appellants complain that the atmosphere of the trial below rendered impossible that objective and unprejudiced hearing to which they were entitled. Specifically, they contend that the "mass conspiracy" trial, the outbursts and conduct of some defendants, the comments and actions of the trial judge, and the publicity attending the trial denied them the fundamental fairness required by due process. To appreciate fully the nature of these contentions, and to put the incidents referred to in their proper setting, we must start with the first trial and its abortive ending.

The first trial of this indictment began on November 21, 1960, after a number of delays, including a one-week postponement occasioned by the flight of the de-fendant Tuminaro on the eve of trial. It proceeded along its rocky road for six months over every conceivable type of obstruction and interruption. On May 15, 1961, the eve of summations, it ground to a halt after the foreman of the jury broke his back in an unexplained fall down a flight of stairs in an abandoned building in the middle of the night. No alternate jurors (four had been originally empanelled) remained and a mistrial was declared. As this court has already had occasion to consider the mis-adventures in the first trial and the misconduct of the defendants which resulted in their remand and in contempt actions against some of them, they will not be fully catalogued here.[5]

At the conclusion of the first trial, the defendants were enlarged on bail and, with the court's permission, various attorneys from the first trial were discharged from their representations. The case appeared at regular monthly intervals on the trial calendar beginning June 19, 1961. On each occasion it was adjourned because a number of the defendants said that they had been unable to retain counsel notwithstanding their ability to raise substantial bail. As early as July 31, 1961, Judge Murphy sensed "that the failure to retain counsel was part of a plan to postpone trial." Despite efforts of the court and threats of contempt proceedings, it was not until March 9, 1962, that all defendants who had not been severed on the government's motion had counsel, either retained or appointed by the court. After further delays and substitutions of counsel (to be treated more fully below), the trial began on April 2.

During the polling of jurors on this opening day of trial, the first outburst by Salvatore Panico occurred. This incident was a precursor of events to come. Similar outbursts by Panico and other defendants[6] became commonplace. On

5. See United States v. Bentvena, 288 F.2d 442 (2d Cir.), aff'd sub nom., Fernandez v. United States, 81 S.Ct. 642, 5 L.Ed.2d 683 (1961); United States v. Galante, 298 F.2d 72 (2d Cir. 1962).

6. Eleven defendants were punished for contempt for their behavior during trial.

one occasion Panico climbed into the jury box, walked along the inside of the rail from one end of the box to the other, pushing the jurors in the front row and screaming vilifications at them, the judge, and the other defendants. On another occasion, while the defendant Mirra was being cross-examined by the Assistant United States Attorney, Mirra picked up the witness chair and hurled it at the Assistant. The chair narrowly missed its target but struck the jury box and shattered. The trial judge responded to these outbursts by having the perpetrators gagged and shackled. We have described only two of the more dramatic disturbances which plagued the trial of this case for we find it neither necessary nor judicious to publicize or preserve the vile language and rebellious conduct that characterized this trial. Suffice it to say that more abhorrent conduct in a federal court and before a federal judge would be difficult to conceive.

In addition to the courtroom conduct of the defendants, they engaged in a series of off-stage activities designed to delay and prolong the trial.[7] On April 16, the defendant Sciremammano fell or tripped down two stairs at the Federal Detention Headquarters. Because of this, no testimony was taken on April 16 or on the morning of the 17th in order to permit a physician to examine Sciremammano, first in the Courthouse and then in a hospital. No objective signs of injury were found. The physician stated that in his opinion Sciremammano was feigning his "agony". Nonetheless, he refused to come to court and, when brought in a wheelchair, insisted that he was too sick to continue. No testimony was taken on the afternoon of April 18 because of the illness of the defendant Struzzieri. Mirra and Salvatore Panico, on one occasion, claimed that they had been drugged and were unable to remember what had transpired in the courtroom. In the early hours of June 7 Salvatore Panico was found by a cor-

rection officer at Detention Headquarters hanging by a belt in a cell which he occupied with his brother and another prisoner. Thus, the opening of court was delayed. Panico was unharmed and was able to continue the trial later that day. A court-appointed psychiatrist noted with reference to this incident, "the ostensible attempt at self-hanging occurred under circumstances justifying suspicion" as to its genuineness. The following morning, in the shower room, while preparing to come to court, and with his brother and other prisoners in the room, Salvatore Panico made 14 widely-spaced shallow cuts on his forearm between the elbow and wrist. Panico's wounds were sutured with little loss of blood. On Monday, June 11, Monastersky's attorney informed the court that his client had fallen in the shower and had injured his arm. As with the others above-mentioned, it was asserted that Monastersky was so affected by the medication he received (an aspirin-like compound) that he was groggy and unable to follow the proceedings. Monastersky's symptoms are claimed to have persisted during the remainder of the week.

▪ All appellants, even the perpetrators, complain of the prejudicial effect of the outbursts of the defendants. They claim that this prejudice was accentuated by the nature of the trial itself, that is, a mass conspiracy trial in which fourteen defendants were tried together. They contend that the rulings of the trial judge, in failing to declare a mistrial or sever the unruly defendants, and in ordering some of the defendants gagged and shackled and ordering an increased number of marshals to be present in the courtroom, constituted reversible error. We find no abuse of discretion in the trial judge's actions taken to preserve the security of the courtroom. If any one distinct impression is gained from a scrutiny of the record here, it is that the trial judge was justified, indeed was

---

**7.** The first trial was bedeviled by similar "illnesses" of the defendants. See Unit-ed States v. Bentvena, supra, 288 F.2d at 445–46.

forced, to resort to stern measures to obtain order in his courtroom.

As to his failure to sever certain defendants and to declare a mistrial after these outbursts, we look to our recent decision in United States v. Aviles, supra. There, as here, a defendant burst into a tirade before the jury accusing his co-defendants. There, as here, the trial judge promptly instructed the jury to disregard the outbursts. We said, in answer to the contention that reversal was required:

> "Manifestly it was not error to deny the mistrial motions. If such conduct by a co-defendant on trial were held to require a retrial it might never be possible to conclude a trial involving more than one defendant; it would provide an easy device for defendants to provoke mistrials whenever they might choose to do so. Under all the circumstances the trial judge's instructions adequately dealt with the situation and his denial of the mistrial motions was proper." 274 F.2d at 193.

This case differs from Aviles only in that the outbursts of the defendants were more numerous and more offensive. But the trial judge instructed the jury to ignore the outbursts each time they occurred. This is all that he could do apart from taking steps to prevent their repetition. We have satisfied ourselves that the prosecution did not provoke the incidents. The judge did all in his power to minimize their effect, and we find no ground for reversal in the circumstances. Any other answer to these contentions would produce little less than anarchy.

Appellants also seize upon the concern expressed in our recent decision of United States v. Agueci, supra, over the problems inherent in the trial of a mass conspiracy case. Their claim, apparently, is that if this were not a multi-defendant trial, the prejudice engendered by one defendant's outburst could not accrue to the detriment of other defendants for the simple reason that they would not be there. In addition, they assert that if only two or three defendants were on trial, the chance that these disturbances would occur would be lessened.

Law enforcement and fair trial for those accused of violations is not to be limited to the pattern chosen by defendants. The administration of criminal justice in the federal courts will not be delivered into the hands of those who could gain only from its subversion. Our decision in Aviles is as applicable to a trial of two defendants as it is to a trial of fourteen. It may take two to conspire but it takes only one to throw a chair at a prosecutor.

Appellants claim that the trial judge should have severed each offending defendant after an outburst. Why this course of action was required we fail to see. After the incident had occurred, severance would not have protected the remaining defendants from any possible prejudice. It would simply have afforded each defendant an easy escape from the trial. Appellants insist, however, that Salvatore Panico should have been severed because even if he were competent to stand trial, he was so mentally ill during the trial that his continued presence and conduct prejudiced the rights of the other defendants to a fair trial. Their claim is that even if prejudice resulting from the outbursts could not have been erased, the judge was obligated to sever Salvatore Panico after it became apparent that he could not control himself and that other outbursts would be forthcoming.

 Rule 14 of the Federal Rules of Criminal Procedure [8] provides for an

---

8. "Rule 14. Relief from Prejudicial Joinder

"If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

exercise of discretion by the trial judge as to whether, at any point in the trial, there appears to be a possibility of sufficient prejudice to any defendant to warrant a severance, Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L. Ed.2d 921 (1959); Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L. Ed. 101 (1954); and the exercise of that discretion will be corrected only if abused. Dowling v. United States, 249 F.2d 746 (5th Cir. 1957); United States v. Haupt, 136 F.2d 661 (7th Cir. 1943). We have recently had before us the contention that Salvatore Panico could not be punished for contempt because he "was too mentally ill to formulate the intent to be contumacious." United States v. Panico, 308 F.2d 125 (2d Cir. 1962). We there quoted at length from the trial judge's certificate filed pursuant to Rule 42(a) of the Federal Rules of Criminal Procedure and concluded as follows:

> "We do not think that the conclusion of Judge MacMahon with respect to the deliberate and calculated nature of defendant's acts constitutes reversible error." 308 F.2d at 127.

Accepting that conclusion here, little remains of appellants' claims that the trial judge abused his discretion in failing to sever Panico. The trial judge found, from his own extensive observation of Panico, and from the reports of psychiatrists that examined him, that Panico's acts were deliberate and calculated to disrupt the trial. This being so, he stands in no different position than the other unruly defendants and, as we have said, there was no abuse of discretion in refusing to grant a severance because of their actions.

All appellants also contend that the trial judge's attitude towards the defendants and their counsel, as revealed by his comments and rulings, prejudiced the jury against them. To support these claims, appellants direct our attention to isolated incidents, invariably taken out of context, and ask us to conclude therefrom that the trial judge abandoned his proper sense of impartiality and placed the weight of his position on the side of the prosecution.

The trial judge, in his attempt to bring this case to trial and to see it brought to an orderly and expeditious conclusion, was presented with a host of problems calling for the exercise of his discretion. Having the experience of the first trial before him, he had to make certain that the trial proceeded with reasonable dispatch and, at the same time, guarantee that all steps be taken to safeguard the rights of the defendants. In view of the unprecedented tactics employed to impede the continuance and resolution of this trial, we find that the actions and rulings of the trial judge were reasonable and often necessary to prevent the frustration of justice.

Appellants strenuously urge upon us two incidents in particular that are alleged to typify the trial judge's attitude. The first concerns the identification of Struzzieri by a government agent.[9] When the Agent was asked to do so by the prosecutor on direct examination, he identified Struzzieri as the one "with the gray suit, he has a black tie on." Struzzieri, in fact, had a gray suit and white tie on. When defense counsel called attention to this fact, the judge had the witness step down and touch the defendant he identified as Struzzieri. He identified the right man. Defense counsel then asked the judge to put a description of the clothing worn by Struzzieri in the record. The judge responded:

> "The Court has already indicated what happened. I will simply say that Struzzieri does not have on a black tie. He does have on a dark gray suit. I also say for the record that there was no doubt in the

9. This incident has been considered by this court once before. See United States v. DiPietro, 302 F.2d 612 (2d Cir. 1962).

Court's mind who was identified. It will be for the jury to decide, however."

Appellants contend that this was an unwarranted intrusion by the trial judge into the province of the jury and that it exemplified the judge's partial attitude. The facts do not justify appellants' conclusion.

■ At a pretrial conference, the trial judge asked defense counsel to devise a seating arrangement for themselves and for the defendants and he informed them that he would agree to anything reasonable. Defense counsel asked to be able to shift the defendants around as they saw fit. The trial judge refused this request on the ground that it would create disorder but agreed to an arrangement whereby the defendants would sit behind their respective counsel. Some time just before the incident in question, DiPietro left the seat he ordinarily occupied and took a seat immediately to Struzzieri's left. DiPietro was dressed in a light gray suit and wore a black necktie. The shades of Struzzieri's dress were just the opposite; he wore a dark gray suit and a white tie. Up to this point in the trial, each time a witness was asked to identify a defendant, that defendant stood up, either at the direction of his counsel or without being asked, before the identification took place. The witness involved in this incident was asked to identify both Bentvena and Struzzieri. Bentvena stood up and the witness identified him; Struzzieri stood up and the witness identified him but remarked that he had a black tie on. Defense counsel, who had their backs to both DiPietro and Struzzieri, wheeled around and asserted that the witness had identified DiPietro. The trial judge concluded that the defendants had engaged in a pre-arranged attempt either to confuse the witness or mislead the jury. On the basis of the facts of record set out above, and our own detachment from the atmosphere of these proceedings, we can neither say that he was wrong in his conclusions nor that

his statements made in the presence of the jury were improper.

■ The second incident concerns the trial judge's characterization, in the presence of the jury, of certain outbursts by defendants as "a put-up job." On the morning of May 25, 1961 shortly after the first witness of the day had assumed the stand, the following occurred:

Defendant Salvatore Panico: "DiPietro is talking about me there. He is the convicted dope pusher. Separate me from him."

Defendant DiPietro: "Stop him. I told you, Al."

Mr. Krieger: "I move for a mistrial as far as DiPietro is concerned."

(Deputy marshals escort Salvatore Panico from the courtroom.)

\* \* \* \* \* \*

The Court: "Your motion for a mistrial is denied, Mr. Krieger. It is obviously a put-up job."

It should not be the function of an appellate court with all the advantages of hindsight to substitute itself for the trial judge and to declare how it might have handled each situation or to deliver lengthy admonitions to trial judges on the proprieties of conducting these difficult criminal trials and the need to avoid embroilment with defendants and defense counsel despite the kind of provocation evident here. This was but one incident in a trial that lasted almost three months. It was not, as appellants contend, an indication of the hostility of the trial judge toward the defendants and their counsel. We have described sufficiently the outrageous conduct of the defendants at this trial. We find that the trial judge, notwithstanding this harassment, maintained an impartial attitude and did all in his power to safeguard the rights of the defendants and to minimize the effects of these outbursts. After the incident in question, as after all similar disturbances, the judge instructed the jury to ignore it. We find no ground for reversal here.

## B. *Newspaper Publicity*

During the course of the trial, certain articles appeared in the New York newspapers specifically referring to the trial and some of the defendants. These articles called attention to the reason for the declaration of a mistrial in the first trial and described some of the defendants as "delegates to the 1957 underworld convention in Apalachin" and as linked to "the Mafia." Upon being advised of the contents of these articles, the trial judge conducted a number of *"voir dires"* of the jury. No juror had read any of the articles. One juror indicated that his wife, in an effort to find out what case he was sitting on, showed him two newspaper articles. He glanced at one long enough to realize that it was about this case and then put it aside and refused to discuss it further with her. He gave every assurance that the article had not prejudiced him. The judge, nevertheless, discharged him from the jury.

After each *voir dire* and before each day's recess, with one exception, the judge cautioned the jurors against reading anything that related to this trial or to narcotics generally and to refrain from discussing the case with anyone. In addition, the trial judge had the United States Attorney write to all New York publishers requesting that they avoid publishing articles related to the case. This request was complied with until the misconduct of the defendants reached such violent and bizarre extremes that the voluntary ban was lifted by the press. Even then, only one article appeared that discussed the happenings of the trial. It is evident from the record here that the trial judge was extremely sensitive to the problems raised by adverse newspaper publicity.[10] He took every precaution possible to prevent the publication of prejudicial articles and repeatedly admonished the jury to avoid contact with any such publicity.

"The crux of the matter is whether the statements were so preju-

dicial as to require the trial judge, who has large discretion in such matters, * * * to empanel a new jury." United States v. Feldman, 299 F.2d 914, 917 (2d Cir. 1962). Here there was no showing that any juror came into contact with such matter, nor was there, of course, any showing that a juror could not serve in a fair and impartial manner. That, coupled with the affirmative action taken by the Government and the trial court's continuing efforts to secure a fair and impartial jury, clearly compel the conclusion that appellants suffered no prejudice. United States v. Agueci, supra; United States v. Leviton, 193 F.2d 848 (2d Cir. 1951), cert. denied, 343 U.S. 946, 72 S.Ct. 860, 96 L.Ed. 1350 (1952).

## C. *Denial of Right to Counsel—Adequacy of Time to Prepare for Trial*

A number of appellants contend that they were denied the effective assistance of counsel by the trial judge's refusal to postpone commencement of the trial so that defense counsel could adequately prepare. At a pretrial conference held on March 9, 1962, the trial judge set the case for trial on March 19th. One of the assigned counsel had been appointed as recently as March 2nd. In rejecting applications for adjournment, the trial judge explained that the case had been tried once before, that they were in the advantageous position of having the Government's case set out in the record, and that the facts of the case could easily be mastered by the date set for trial. On March 16th at another pretrial conference, the trial court relieved Mancino's counsel of his assignment because of health and substituted another attorney, adjourning the trial for two weeks to enable the newly assigned counsel to prepare. The trial judge was of the opinion, in view of the assurance given by the new attorney's firm that he would be given sufficient assistance, that he could be prepared by April 2nd.

The disposition of a request for continuance rests in the discretion of

---

10. The transcripts of all hearings relating to newspaper publicity were ordered sealed by the trial judge to safeguard further the rights of the defendants.

the trial judge and the exercise of that discretion will not be disturbed unless a clear abuse is shown. See, e. g., Avery v. Alabama, 308 U.S. 444, 60 S.Ct. 321, 84 L.Ed. 377 (1940); Johnson v. United States, 291 F.2d 150 (8th Cir. 1961), cert. denied, 368 U.S. 880, 82 S.Ct. 130, 7 L.Ed.2d 80 (1961); Torres v. United States, 270 F.2d 252 (9th Cir. 1959), cert. denied, 362 U.S. 921, 80 S.Ct. 675, 4 L.Ed. 2d 741 (1960); Bunn v. United States, 260 F.2d 313 (8th Cir. 1958); Thomas v. United States, 252 F.2d 182 (9th Cir. 1958); United States v. Kelley, 186 F.2d 598 (7th Cir.), cert. denied, 341 U.S. 954, 71 S.Ct. 1004, 95 L.Ed. 1375 (1951); United States v. Wight, 176 F.2d 376 (2d Cir. 1949), cert. denied, 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950). The test here is whether the lack of effective assistance of counsel was such "as to shock the conscience of the Court and make the proceedings a farce and mockery of justice." United States v. Wight, supra, 176 F.2d at 379; Avery v. Alabama, supra, 308 U.S. at 450, 60 S.Ct. 324. And the "time consumed in oral discussion and legal research is not the crucial test. * * * The proof of the efficiency * * * lies in the character of the resultant proceedings." United States v. Wight, supra, 176 F.2d at 379.

We find no abuse of discretion here. We have already referred to the difficulties experienced in bringing this case to trial a second time. The defendants and the government had grave interests at stake in seeing that further procrastination be avoided and that the trial be commenced without delay. The trial court was authorized, indeed was required to take whatever reasonable steps he could to effectuate those ends. His action, in setting the case peremptorily against both sides and directing that the trial begin on April 2nd, was such a reasonable step. The contention that it was an abuse of discretion is belied by the zeal and quality of the performance rendered by defense counsel at trial and before this court.

## 1. The Panicos and Loicano

Carmine and Salvatore Panico and Angelo Loicano contend that they were deprived of adequate and effective counsel and were denied their constitutional right to be represented by counsel of their own choosing. On September 5, 1961, Albert C. Aronne, Esq., filed notices of appearance for both Panicos. Mr. Aronne was not present at the first pretrial conference held on March 9th but did appear for the second conference on March 12th. He there moved to withdraw his appearance asserting that it was never intended that he would try the case because the Panicos did not want him as trial counsel; that he was not familiar with the procedure in the federal courts and that he had not been paid. The trial court denied the motion on the ground that it came too late. In the afternoon of March 29th, three days before trial, Mr. Aronne informed the trial court that he had been ordered to trial in a state court and would be detained there for about a week. On October 23, 1961, Sylvester Cosentino, Esq., filed a notice of appearance on behalf of Loicano. In the first morning of trial, Mr. Cosentino did not appear and it was found that he was in the hospital.

Thus, on the first day of trial, there were three defendants who did not have counsel in court. In an attempt to proceed with the trial, the judge requested that other counsel cover for the missing attorneys until they returned and that the defendants agree to such coverage. Neither request met with any success, the Panicos now deriving comfort only from Mr. Aronne's representation.

Defense counsel on this first morning were also in the process of substituting counsel for a number of defendants. When all the switches had been made, George Todaro, Esq., ended up relieved of his representation of other clients. The trial court assigned him to represent the two Panicos and Loicano until such time as their retained counsel re-

turned or they obtained other counsel.[11] Later, the court directed the prosecution not to put in evidence directly relating to these defendants until their retained counsel returned. Accordingly, the testimony through April 11th dealt primarily with the substantive counts and did not directly involve the Panicos or Loicano. Mr. Aronne returned on April 11th and the Judge afforded him an opportunity to review the existing trial record and make any motions on behalf of the Panicos, or recall any witnesses for further cross-examination. He also offered Mr. Aronne the opportunity to make an opening address on behalf of the Panicos after the Government rested, despite their explicit waiver of an opening. Mr. Cosentino returned on April 16th and the same opportunities were made available to him. From April 11th, when testimony concerning Loicano began, to April 16th, Mr. Todaro was representing only Loicano. These three appellants claim that the trial judge, by proceeding with the trial while their retained counsel were absent and by appointing Mr. Todaro to represent all three on an interim basis, deprived them of the effective assistance of counsel and the right to counsel of their own choice.

A defendant in a federal court is, of course, entitled under the Sixth Amendment to the assistance of counsel for his defense, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and where he is able to obtain counsel for himself he must be given a reasonable time and a fair opportunity to secure counsel of his own choosing. Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958); Chandler v. Fretag, 348 U.S. 3, 75 S.Ct. 1, 99 L.Ed. 4 (1954). An accused's right to select his own counsel, however, cannot be insisted upon or manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice. United States v. Terranova, 309 F.2d 365 (2d Cir. 1962); United States v. Arlen, 252 F.2d 491 (2d Cir. 1958); United States v. Paccione, 224 F.2d 801 (2d Cir.), cert. denied, 350 U.S. 896, 76 S.Ct. 155, 100 L.Ed. 788 (1955); United States v. Mitchell, 138 F.2d 831 (2d Cir. 1943), cert. denied, 321 U.S. 794, 64 S.Ct. 785, 88 L.Ed. 1083 (1944). Thus, if a defendant does not give the court adequate notice that his retained counsel will be unable to attend the trial, the trial court may, in the exercise of its sound discretion, do what is reasonably necessary to meet the situation. And where the inability of retained counsel to serve gives promise of unreasonable delay or inconvenience in completing the trial, the court may require the defendant to secure other counsel. Releford v. United States, 288 F.2d 298 (9th Cir. 1961); Lee v. United States, 98 U.S.App.D.C. 372, 235 F.2d 219 (D.C.Cir.1956); Smith v. United States, 288 F. 259 (D.C.Cir.1923).

We find that the judge acted reasonably in the circumstances. The delay that would have been caused by acceding to the Panicos' vacillating desire to have Mr. Aronne represent them at trial, and Loicano's insistence on Mr. Cosentino's services despite the knowledge of his heart condition and the fact that this condition had caused repeated motions for adjournments in the first trial is precisely the kind of obstruction which the right to counsel of one's own choice must not be allowed to produce. These appellants refused to obtain other counsel and rejected the court's attempt to obtain coverage from the other defense counsel. They demanded that the court close its doors until they and their counsel were ready for trial. One with a bent for statistics would find, no doubt, that if this trial were continued on every occasion that one or more of the defendants or their counsel so requested the trial would still be in progress. This disruption of the court's business and tampering with the rights of the other defendants and the government cannot be

---

11. This appointment was challenged in a mandamus proceeding before this court. The writ was denied. Loicano v. Mac-Mahon, 2d Cir. Docket No. 27487, April 4, 1962.

tolerated. See United States v. Mitchell, supra. The steps taken by the court during retained counsel's absence and the opportunities made available to them on their return fully protected the rights of these appellants.

■ These three appellants, relying on Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), also contend that the appointment of Mr. Todaro to represent all three denied them the effective assistance of counsel. This claim is baseless. As the Supreme Court recognized in Glasser, and as the circuits have recognized since that case was decided, an appellant must show some conflict of interest between himself and the other defendants represented by his attorney before he can claim successfully that the joint representation deprived him of his right to counsel. See Wynn v. United States, 107 U.S.App.D.C. 190, 275 F.2d 648 (D.C.Cir.1960); Lebron v. United States, 97 U.S.App.D.C. 133, 229 F.2d 16 (D.C.Cir.1955), cert. denied, 351 U.S. 974, 76 S.Ct. 1035, 100 L.Ed. 1492 (1956); Lott v. United States, 218 F.2d 675 (5th Cir. 1955); Sanders v. United States, 183 F.2d 748 (4th Cir. 1950), cert. denied, 340 U.S. 921, 71 S.Ct. 352, 95 L.Ed. 665 (1951); United States v. Dennis, 183 F.2d 201 (2d Cir. 1950), aff'd 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, rehearing denied, 342 U.S. 842, 72 S.Ct. 20, 96 L.Ed. 636 (1951); Kennedy v. Sanford, 166 F.2d 568 (5th Cir.), cert. denied, 333 U.S. 864, 68 S.Ct. 737, 92 L.Ed. 1143 (1948); Setser v. Welch, 159 F.2d 703 (4th Cir.), cert. denied, 331 U.S. 840, 67 S.Ct. 1510, 91 L.Ed. 1851 (1947); Farris v. Hunter, 144 F.2d 63 (10th Cir. 1944). As noted above, Mr. Todaro represented these three appellants during a part of the trial in which no significant evidence was introduced against any of them. In compliance with the court's instructions, the prosecution put in evidence relating only to the substantive counts in which none of them were named. No conflict of interest is pointed to by appellants and none is apparent to us.

### 2. Galante

■ On September 5, 1961, Nicholas P. Iannuzzi, Esq., filed a notice of appearance for Galante. On the first afternoon of trial he sought to withdraw in favor of Miss Frances Kahn, who told the court that she had been retained some three weeks earlier but had not had the opportunity to so advise the court. The trial judge permitted Miss Kahn to appear as co-counsel and conduct the defense but explicitly refused to relieve Mr. Iannuzzi of his representation. On June 12, Miss Kahn suffered one of the injuries that plagued defense counsel during the trial of the case. No proceedings were held on this day and the court summoned Mr. Iannuzzi to appear. Galante was afforded an opportunity to obtain other counsel if he so desired. During the remainder of the week, Galante refused Mr. Iannuzzi's assistance. On June 18th Mr. Iannuzzi turned himself into the hospital. Doctors appointed by the court to determine the physical conditions of Miss Kahn and Mr. Iannuzzi could find no objective symptoms of injury or illness. The court called in Kenneth O'Connor, Esq., to whom Galante had spoken the previous week about representing him, and assigned him to represent Galante. Galante objected to this assignment, objected to representing himself, and failed to get other counsel. Galante's claim that he was denied the effective assistance of counsel of his own choice is sufficiently answered by what we said in relation to the similar claims of the Panicos and Loicano. The happenings below demonstrate quite forcefully why the courts have had occasion to say that the right to counsel cannot be manipulated so as to interfere with the fair administration of justice. The trial court's conclusion that manipulation was afoot is not so devoid of basis as to require reversal.

### 3. Mirra

■ Mirra contends that he was denied the right to act as his own counsel by the trial court's denial of his request to discharge his defense counsel

and conduct the cross-examination of the chief government witness, Smith, himself. Mirra had been represented with great skill throughout the trial by appointed counsel. Mirra indicated no dissatisfaction with his counsel and apparently relied solely on his right to represent himself. One charged with crime has an absolute right to do without an attorney and conduct his own defense (28 U.S.C. § 1654), but that is quite different from the right to discharge counsel after trial has begun. This latter right is a qualified one. United States ex rel. Hyde v. McMann, 263 F.2d 940 (2d Cir.), cert. denied, 360 U.S. 937, 79 S.Ct. 1462, 3 L.Ed.2d 1549 (1959); United States v. Dennis, supra; United States v. Mitchell, 138 F.2d 831 (2d Cir. 1943), cert. denied, 321 U.S. 794, 64 S.Ct. 785, 88 L.Ed. 1083 (1944); United States v. Gutterman, 147 F.2d 540, 157 A.L.R. 1221 (2d Cir. 1945). The contention of Mirra is much like the claim that was raised in United States v. Dennis, supra. We there said:

> "If the judge feared that the result would be, as he said, another of those 'outbursts' which he had found it so hard to deal with, it appears to us that he was within his powers to confine Davis to the exceptionally capable protection of Mr. Sacher. To deprive a judge of that much control over such an issue would play into the hands of any accused who might seize the opportunity still further to confuse a trial, already much confounded." 183 F.2d at 234.

The record discloses that Mirra had excellent representation by counsel who took advantage of every opportunity by motion, examination and cross-examination to protect his interests.

### D. *The Charge*

Appellants contend that the court "failed at any point in his charge on the conspiracy count to instruct the jury that knowledge of illegal importation was a necessary element of the conspiracy", and thereby committed the plain and reversible error we condemned in United States v. Massiah, 307 F.2d 62, 70 (2d Cir. 1962). We hold that the charge was sufficient.

At the beginning of the charge on conspiracy, the trial court had the first four paragraphs of the conspiracy count of the indictment read to the jury. These paragraphs, after enumerating the defendants and conspirators, specifically stated the purpose of the criminal enterprise—to unlawfully import narcotics into the United States, and to deal in narcotics knowing them to have been illegally imported. Immediately thereafter, the court, in substance repeated what had just been read, by explaining that the defendants were charged with conspiring to violate Sections 173 and 174 of Title 21 U.S.C., and by reading the pertinent portions of the statutes.

There is thus an important difference at the outset between the charge in the present case and that given in Massiah. In Massiah, the trial court read the appropriate portions of 21 U.S.C. § 173 and § 174 to the jury, but he also read the conspiracy section of the Criminal Code, 18 U.S.C. § 371, and expressly instructed the jury that it was the violation of this provision that was charged in the indictment. The indictment was not read to the jury at all. The many references in the remainder of the court's instructions as to the conspiracy "charged in the indictment" simply compounded the error.

In the present case, the court, at the very outset of the conspiracy charge, read both the indictment and the statutes, 21 U.S.C. §§ 173, 174 under which the defendants were being tried. He did not read the general conspiracy statute, 18 U.S.C. § 371. It must thus have been clear to the jury from the outset that the defendants were charged with conspiring to import narcotics or to deal in them, knowing of their illegal importation. Each reference thereafter to the conspiracy "as charged in the indictment" rather than compounding the error reemphasized the need for such a finding, and directed the attention of the jurors to the appropriate language in the copy of the indictment that they had with them during their deliberations.

After reading the statutes and the indictment, the court continued:

"There are only three elements of the crime of conspiracy:

(1) The existence of the conspiracy *as charged in the indictment;*

(2) That a defendant knowingly and with wilful intent associated himself with the conspiracy; and

(3) The commission by any conspirator of at least one of the overt acts set forth in the indictment." (Emphasis supplied.)

Then, in discussing the first element, he charged:

"The first element is satisfied if, from proof of all the relevant facts and circumstances, you find beyond a reasonable doubt that the minds of at least two alleged co-conspirators met in an understanding way so as to bring about an agreement to illegally import and distribute narcotics as charged."

Appellants urge that this language rendered the charge even more erroneous than that in Massiah because the jurors were thus "affirmatively told that they could find all the appellants guilty on count eight if but two of the conspirators knew about the illegal importation." On the contrary, this sentence, read in context,[12] permitted the jurors to convict only as to those defendants who knew of the illegal importation, and thus saved the charge from error. Very shortly following this sentence, the court further charged:

"You may find that the conspiracy existed even if you find that one or more of the persons charged were not members. It is sufficient if any two or more persons have conspired.

*You may find those defendants guilty who joined the conspiracy with knowledge of its purpose and acquit those who did not join.*" (Emphasis supplied.)

It was thus made clear that as few as two may be conspirators, but that each must know of the illegal importation. The first passage quoted defined conspiracy, the second, its members.

Later, in dealing with the distinction between single and multiple conspiracies, the court reiterated this analysis:

"Such a conspiracy [single] may be shown to exist, you will recall, if two or more of the defendants or co-conspirators in some way or manner came to a mutual understanding to accomplish the broad objectives set out in the indictment. Whether or not each defendant joined this conspiracy is another matter which I shall come to in a moment."

Finally, the judge concluded his instructions as to the existence of the conspiracy, and began his charge on its membership as follows:

"If, after considering all the evidence, you decide that the government has failed to prove, beyond a reasonable doubt, the existence of one overall conspiracy *to import and deal in narcotics illegally as charged,* you must acquit all the defendants on count 8.

"On the other hand, if you are satisfied, beyond a reasonable doubt, that the government has proved one overall conspiracy to import and deal in narcotics illegally as charged, *the second element which you must next decide, as to each defendant separately, is whether the government has proved, beyond a reasonable doubt, that he knowingly and intentionally joined or became a member of the conspiracy with knowledge of its unlawful purpose.* \* \* \*

"The mere fact, however, that a defendant may be present at meetings or associated with members of the conspiracy is not in itself enough

12. See United States v. Agueci, supra, 310 F.2d at 825; Carey v. United States, 296 F.2d 422, 426 (D.C.Cir. 1961).

to make him a conspirator unless you first find that he intentionally joined a conspiracy *with knowledge of its purpose.* * * *

"Those who come in later, *with knowledge of the aims and purposes of the conspiracy,* and cooperate in a common effort to attain the unlawful results, become parties to the conspiracy. All of the conspirators need not be acquainted with each other. They may not have previously associated together. One may become a member of the conspiracy without full knowledge of all of the details of the conspiracy. One defendant may know only one other member of the conspiracy, yet, *if he knowingly cooperates to further the object of the conspiracy,* with knowledge that others have combined to violate the law, he becomes a member although his role may be only a subordinate one." (Emphasis supplied.) [13]

 Defense counsel did not except to these portions of the charge. Certainly the lack of further emphasis on this element did not amount to that "plain error" necessary to warrant re-

versal in the absence of exception taken below. See Fed.R.Crim.P. 30, 52(b). There is no "plain error" unless the "charge may have resulted in a miscarriage of justice or in the denial to appellant[s] of a fair trial." Herzog v. United States, 235 F.2d 664 (9th Cir. in banc), cert. denied, 352 U.S. 844, 77 S.Ct. 54, 1 L.Ed.2d 59 (1956). That is not the case here.[14]

E. *Limitations on Cross-Examination of Smith*

 Appellants complain that they were unduly restricted in their cross-examination of the witness Smith. We find no merit in the contention. The trial court permitted extensive and repetitious examination of Smith as to any matters bearing on his credibility, his bias toward the defendants, and his motive for testifying. In addition, the defense had an abundance of material from which to examine Smith, including but not limited to, a statement produced under the Jencks Act, extensive grand jury minutes, Smith's testimony in the first trial, his testimony in an unrelated proceeding in Illinois, and his testimony before an Inquiry Officer of the Immigration and Naturalization Service in 1958. Defense

---

13. This sentence was held in the context of the *Massiah* charge to have compounded the error therein. In the context of the entire charge in the present case, it was clearly correct. See United States v. Agueci, supra, 310 F.2d at 825; United States v. Aviles, supra, 274 F.2d at 188.

14. Several appellants contend that in marshalling the evidence the trial court erred in failing to mention certain details favorable to them. We shall deal with several specific allegations of error at a later point. Reviewing the charge as a whole, we find that the trial judge carefully and specifically summarized the evidence favorable to the defendants, as well as that favorable to the government, in a manner well designed to insure separate consideration by the jury of the evidence for and against each individual defendant. In exercising his broad discretion in marshalling the evidence, the trial judge was not required to comment on every tidbit of evidence in the lengthy trial that each litigant considered most favorable to him. Allis v. United States, 155 U.S. 117, 124, 15 S.Ct. 36, 39 L.Ed.

91 (1894). Moreover, the judge carefully instructed the jury that it must consider *all* the evidence, that he could not review the evidence in its entirety, that his reference to certain evidence and not to other evidence did not indicate that he considered that which he mentioned more important, and that in any event, it was the jury's recollection that controlled.

The appellants further contend that the trial judge committed reversible error by taking from the jury the factual issue of whether the witness Smith was an accomplice in the conspiracy, and in effect instructed them that Smith was an accomplice as a matter of law. Appellants misread the charge. In the passage complained of, the trial court correctly restated Smith's testimony that "by his own admission [he was] an accomplice" to the crime charged. He then cautioned the jury that in light of this admission, it must scrutinize Smith's testimony with special care. This instruction framed in almost identical language, was approved by this court in United States v. Agueci, supra, 310 F.2d at 833.

counsel were allowed great latitude in utilizing these materials and were permitted to inquire into many matters of a remote nature. See, e. g., United States v. Aviles, supra.

### F. *Cadieux Testimony*

Several defendants raise objections to the reading to the jury of the testimony given by Suzanne Cadieux at the first trial. She had there testified that in December of 1958 she had seen the defendant DiPietro make a payment of $47,000 to Pepe Cotroni for the delivery of a package of narcotics and that in February of 1959 she saw Galante meet with the Cotroni brothers, Stepanoff, Robert and an American attorney to arrange for the delivery of $5,500 worth of heroin to that attorney. She also testified as to the incident in which she was threatened by the defendant Mirra after Cotroni's arrest.

On January 9, 1962, Mlle. Cadieux executed an affidavit in Canada, disclosed by the Government early in the retrial, recanting her prior testimony in its entirety and stating that it was all a lie induced by her desire to help Rene Robert then incarcerated in Canada. Her affidavit also contained implications of subornation of her perjury on the part of the Assistant United States Attorney.

At the second trial, the Government moved for permission to read her testimony given at the first trial to the jury on the grounds that she was unavailable as a witness. A *voir dire* on this motion disclosed that the Government's efforts to contact her after her recantation had met with no success, although defense counsel encountered no such difficulties. The Court properly held that she refused to come to the United States as a witness without any complicity on the Government's part, apparently out of fear that she would subject herself to a perjury charge here if she were to testify at the second trial. The trial judge, however, was also of the view that her prior testimony should not be admitted without some disclosure of the exculpatory matter, and permitted defense counsel to take her deposition in Canada as if it were

cross-examination. The Court's finding of her unavailability is buttressed by her refusal to be deposed at the United States Consulate in Montreal, necessitating transfer of proceedings to the Sheraton Mount Royal Hotel. Both her prior testimony and her deposition were read to the jury.

We find no error in this manner of proceeding. Unavailability having been fairly established, her prior testimony was admissible. Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L. Ed. 409 (1895), 5 Wigmore, Evidence § 1404 (3d ed. 1940). See also West v. Louisiana, 194 U.S. 258, 24 S.Ct. 650, 48 L.Ed. 965 (1904). Allowing the deposition to be taken without subjecting the witness to the perjury sanctions available if she had testified here may have given the defendants even greater latitude than they were entitled to. United States v. Soblen, 203 F.Supp. 542, 568 (S.D.N.Y. 1961), aff'd 301 F.2d 236 (2d Cir.), cert. denied, 370 U.S. 944, 82 S.Ct. 1585, 8 L. Ed.2d 810 (1962). There is no merit to the contention that Cadieux's recantation made her prior testimony totally inadmissible. The subsequent extra-judicial statement was merely impeaching material on the credibility of her prior testimony and it was for the jury to decide which, if either, statement was to be believed.

Due to the charges leveled in the Cadieux affidavit at the Assistant United States Attorney, he was permitted to take the stand to testify that at the time Cadieux testified at the first trial, he believed she was telling the truth. The Judge instructed the jury that he was allowing this testimony because if the Assistant believed that Cadieux was lying when he put her on the stand, the jury should acquit the defendants. This testimony was not offered to enhance the credibility of Cadieux' first trial testimony but rather to rebut serious accusations against the Government officer trying the case which, if left unanswered, might have seriously prejudiced the Government. The defense having introduced such material, the Government was clear-

ly entitled to answer it. Cf. United States v. Graham, 102 F.2d 436, 441–443 (2d Cir. 1939). Perhaps the questioning might have been more artfully framed so as to avoid any appearance of the witness's vouching for Cadieux's credibility, but we find no reversible error here. Lawn v. United States, 355 U.S. 339, 359 n. 15, 78 S.Ct. 311, 2 L.Ed. 2d 321 (1958).

## II

### A. *Salvatore Panico*

Salvatore Panico urges that because the trial judge precluded him from testifying in his own behalf, his conviction be reversed.

After several earlier hints, one of the two attorneys representing the Panico brothers informed the court toward the end of the trial that despite counsel's advice to the contrary, Salvatore desired to testify in his own behalf. Counsel were in a somewhat embarrassing position in this regard, having represented to the trial court and to this court in an attempt to mandamus a second psychiatric examination of their client, that they could not communicate with him. Since neither attorney desired to call him, the court directed them to confer with him and his brother again and to advise the court of their decision. Subsequent to this conference, during which Salvatore refused to speak with his attorneys, Carmine Panico, his brother, informed the court that Salvatore still desired to take the stand. The court then called Salvatore before him and informed him that he could testify only to facts. He responded that he only wanted to tell "the truth". The court then continued:

"The Court: But let me tell you now that you cannot take that stand and make any outburst against anybody else.

"Defendant Salvatore Panico: No, I am just going to say the truth, that's all.

"The Court: Are you going to behave as a gentleman on that stand?

"Defendant Salvatore Panico: I am going to say the truth, that's all.

"The Court: Are you going to behave as a gentleman?

"Defendant Salvatore Panico: What do you mean?

"The Court: Behave yourself up here.

"Defendant Salvatore Panico: I am going to say the truth up there. That's what you want. That's what the whole world wants is the truth.

"The Court: You have a right to take the stand."

The court then further advised Panico of his right to remain silent, that he must behave himself on the stand, and that he would be "very severely" punished for contempt if he did not. Finally, the court ordered a fifteen-minute recess and ordered counsel to "prepare him to go on the stand." During the recess, the court overruled an objection by counsel for Ormento to Salvatore's taking the stand, and conferred with his attorneys and with Carmine Panico regarding the questions to be asked. The court warned the marshals to be alert, and ruled that Salvatore would testify from his place in the courtroom, rather than from the witness stand, so that he would be easier to handle in case of a second jury attack or other misconduct.

After dealing with another matter, the court asked counsel whether they could represent to him what Salvatore would testify to. Counsel answered that since he refused to speak to them, they could not say. Thereupon the court ruled:

"I had him up there before me and he wouldn't answer. When I asked him whether he would behave, he kept shouting he is going to tell the truth.

"I hold, under the circumstances, that he has waived his right to take the stand in his own defense. By his failure to cooperate for psychiatric examination and because of his conduct the risk of prejudicing the other defendants is overwhelming. He has done that time and time again and

done so wilfully and deliberately. For those reasons I hold that he voluntarily waived his right to take the witness stand in his own defense."

At common law, the accused was not competent to give sworn testimony in his own behalf in a criminal proceeding. It was thought that competency would be more harmful than helpful to the accused, since the jury might infer guilt if he then failed to take the stand, while cross-examination might place him in a situation where even an innocent man might appear at a disadvantage if he did testify. And it was believed that due to his overwhelming interest in the outcome, testimony of the accused would not and could not be believed. See 2 Wigmore, Evidence § 579 (3d ed. 1940). The right of the accused to be present and to make his defense was jealously guarded, however:

"Wherever one is assailed in his person or his property, there he may defend, for the liability and the right are inseparable. This is a principle of natural justice, recognized as such by the common intelligence and conscience of all nations. A sentence of a court pronounced against a party without hearing him, or giving him an opportunity to be heard, is not a judicial determination of his rights, and is not entitled to respect in any other tribunal." Windsor v. McVeigh, 93 U.S. (3 Otto) 274, 277, 23 L.Ed. 914 (1876).

Toward the end of the last century, the fallacy of the view denying the competence of the accused to testify came to be generally recognized. A federal statute removing the disability was enacted in 1878, 30 Stat. 20, and is contained today without substantial change in 18 U.S.C. § 3481.[15] Similar provisions have been enacted in all states except

Georgia. See Ferguson v. Georgia, 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961).

This statutory "privilege" to testify in one's own behalf has come to be recognized as having an importance similar to the right to be present at one's trial and to present a defense. Thus in Wilson v. United States, 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650 (1893), the court, after referring to the common law rule, said:

"This rule, while affording great protection to the accused against unfounded accusation, in many cases deprived him from explaining circumstances tending to create conclusions of his guilt which he could readily have removed if permitted to testify. To relieve him from this embarrassment the law was passed. In mercy to him, he is by the act in question permitted upon his request to testify in his own behalf in the case. In a vast number of instances the innocence of the defendant of the charge with which he was confronted has been established." id. at 65-66, 13 S.Ct. at 766

The privilege has been described as one of "inestimable value." Yates v. United States, 227 F.2d 844, 846 (9th Cir. 1955). The statute renders the accused competent "provided *only* that he testifies at his own request." Heitler v. United States, 244 F. 140, 141 (7th Cir. 1917) (emphasis supplied). See also Brown v. United States, 56 F.2d 997 (9th Cir. 1932); Wolfson v. United States, 101 F. 430 (5th Cir. 1900). It has been held by at least one state court that denial of the privilege deprives the accused of a fair trial. People v. Rakiec, 260 App. Div. 452, 23 N.Y.S.2d 607 (1940), aff'd 289 N.Y. 306, 405 N.E.2d 812 (1942). See also People v. Rosenzweig, 135 Misc. 324, 239 N.Y.S. 358 (Sp.Sess.1929).

15. "§ 3481. Competency of accused
"In trial of all persons charged with the commission of offenses against the United States and in all proceedings in courts martial and courts of inquiry in any State, District, Possession or Territory, the person charged shall, at his own request, be a competent witness. His failure to make such request shall not create any presumption against him. June 25, 1948, c. 645, 62 Stat. 833."

944

In view of the importance of the privilege, we cannot say that Salvatore Panico waived his privilege to testify in his own behalf. The question appears to be one of first impression, and while we do not wish to indicate that the privilege may never be waived by conduct, the facts in the present case do not warrant that conclusion. Panico's outbursts and serious misconduct earlier in the trial would have warranted a warning that violence on his part or the hurling of obscenities at the objects of his dislike might result in a curtailment of the privilege of testifying. However, that Panico, when testifying, might have attempted to incriminate all the other defendants and to exonerate himself, was to be expected. He might well have desired to testify for this very purpose but this purpose, even if announced in advance, presents no reason for court or counsel for other defendants to preclude him from so doing. He had a right to say in effect, "I never trafficked in narcotics; such narcotics as I saw were in the possession of defendants A, B and C." Whether the jury would have believed him is immaterial; he should have had the opportunity to present his version of the facts. The trial judge is, of course, under a heavy duty to maintain the order and decorum necessary for a fair trial. By permitting Panico to testify, the court might have risked further outbursts. But upon any sign of misconduct, the marshals could quickly have subdued him, and replaced his gag for the remainder of the trial if necessary. The judgment of conviction of Salvatore Panico must be reversed.

B. *Carmine Panico*

Appellant Carmine Panico urges that the error for which we reverse the conviction of his brother Salvatore requires reversal of Carmine's conviction as well. We do not agree.

The questions raised by Carmine's appeal in no way involve the right of a defendant to testify in his own behalf. Rather, the question relates to the discretion of the trial court to preclude counsel for a criminal defendant from calling a certain witness other than the defendant himself. At the outset, it should be noted that counsel did not attempt to call Salvatore as a witness for Carmine and so he may not complain that the witness was not heard.

Even if Carmine's failure to call Salvatore as his witness may be excused because of the obvious futility of such an attempt, there is no error that warrants reversal of Carmine's conviction. Carmine had already testified in his own defense when Salvatore sought to testify. No tender of proof having been made, we may assume that he, if permitted to testify, would have corroborated his brother's story and his testimony would thus have been cumulative. While such corroborative testimony may be of considerable importance, its admission in evidence rests in the sound discretion of the trial court, Fed.R. Crim.P. 26; 6 Wigmore, Evidence §§ 1907, 1908 (3d ed. 1940). Under the facts presented, where the corroborating witness sought to be called has made numerous outbursts and engaged in physical misconduct, the trial judge might have concluded, in the exercise of discretion, that Salvatore Panico would not confine himself to proper testimony in behalf of Carmine, and in view of the risk of prejudice to the other defendants, have precluded Carmine from calling him as a witness.[16]

C. *Galante*

Galante contends that the trial judge abused his discretion in limiting

16. Appellant Galante claims error in that if Salvatore Panico had been permitted to testify, Galante could have shown on cross-examination that Panico's outburst placing Galante at the Appalachin meeting was false. This allegation is totally without merit. All that we have said with regard to Carmine's contention applies with equal force here. Moreover, Salvatore's outburst was not testimony, and he could not properly have been cross-examined regarding its truth or falsity.

the number of alibi witnesses that he could call in his behalf. Smith had testified to seeing Galante in New York on two separate occasions sometime in June, 1958. The alibi offered was that Galante was in Florida during this period and thus could not have been seen by Smith at the time testified to. Three witnesses testified to this effect on behalf of Galante. The trial judge then ruled that only two more witnesses would be allowed to testify to Galante's presence in Florida on the ground that such testimony was cumulative. The court later revised this ruling to allow Mr. O'Connor, who was then representing Galante, to put on all of his alibi witnesses. Mr. O'Connor could not produce any more witnesses but was allowed to read the prior trial testimony of two of these witnesses to the jury. The judge's offer to permit him to read to the jury the prior testimony of another witness was declined.

Galante's claim here is difficult to understand inasmuch as the trial court gave him the opportunity to call as many alibi witnesses as he desired and, when they were not available, allowed their prior testimony to be read to the jury. If the first ruling was error, and we intimate no such view, it was certainly cured by the later ruling.

██ Galante also contends that wiretaps made in violation of § 605 of the Federal Communications Act furnished the basis for the testimony of witness Cadieux and for the indictment. Judge Levet, on the first trial, held an extensive *voir dire* on wiretap problems and concluded that "there has been no indication whatsoever that information 'obtained from taps has * * * led directly or indirectly, to the discovery of any of the evidence' which the government has utilized in the prosecution of the case." Judge Levet was correct. See United States v. Agueci, supra. The wiretaps in question occurred some nine months after Smith began to cooperate with the Government and six months after he had introduced Agent Biase into the conspiracy. The inferences ap-

pellant would have this court draw are without foundation in the record.

D. *Mirra.*

██ Appellant Mirra raises several claims of error apart from those already discussed as to all defendants. His first contention is that the indictment should have been dismissed on the grounds of double jeopardy, alleging that he had been convicted of the same offense in United States v. Stromberg, Cr. 154–86, S.D.N.Y.1958, aff'd, 268 F.2d 256 (2d Cir. 1959), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959). His motion to dismiss on these grounds was denied by Judge MacMahon, who adopted the earlier opinion of Judge Levet at the first trial, Opinion #26832 (S.D.N.Y.). We agree with Judge Levet's conclusion that "The Stromberg and Bentvena conspiracies constitute in fact and law distinct and separate ventures." See United States v. Perrone, 161 F.Supp. 252 (S.D.N.Y.1958). Comparison of the two cases demonstrates disparate factual contexts. Anthony Mirra was the only defendant common to both prosecutions, the overt acts delineated in Stromberg took place between 1951 and 1955 while those in Bentvena took place in 1958 and 1959; the source of the narcotics in Stromberg was France; in Bentvena it was Canada. Neither proof of the facts alleged in the Bentvena indictment nor the proof actually submitted would have been sufficient to convict Mirra of participation in the conspiracy charged in Stromberg. See Ferracane v. United States, 29 F.2d 691 (7th Cir. 1928); United States v. Claus, 19 F.Supp. 435 (E.D.N.Y.1937).

██ Mirra also claims as error the disclosure by the Government to the jury of his prior narcotics conviction in Stromberg, supra. In the Bentvena trial, Mirra took the stand in his own defense and testified that he had been convicted of a crime in 1958. When asked on direct examination if he had ever had anything to do with narcotics, he answered "No". On cross-examination the Government was permitted, over

defense objection, to ask Mirra what the 1958 conviction was for, and to introduce into evidence the record of his prior conviction. Although such evidence might, in the discretion of the trial judge, have been excluded if offered for general impeachment purposes, the defendant, having asserted on direct that he never had any connection with narcotics, opened the door to proof impeaching this specific testimony. Cf. United States v. Colletti, 245 F.2d 781 (2d Cir.), cert. denied, Russo v. United States, 355 U.S. 874, 78 S.Ct. 125, 2 L.Ed.2d 78 (1957); United States v. Nelson, 273 F.2d 459 (7th Cir. 1960). The trial judge properly instructed the jury that this evidence could be used only for impeachment purposes and not to prove Mirra's guilt.

■ In addition, Mirra argues that he was improperly denied certain surveillance reports by officials of the New York State Parole Board and the New York City Police Department covering the period of May and June, 1958, during which Smith and Mirra had allegedly been engaged in various narcotics transactions. The surveillance had been initiated to secure evidence of possible parole violations by the severed defendant David Petillo, and were later turned over to the State Liquor Authority which was investigating Mirra's alleged undisclosed interest in Chickie James' Stable and LaComedie. The trial judge originally denied the reports on the ground that they were privileged, and finally after examining them *in camera*, declined in his discretion to make them available and ordered them sealed.

Passing questions of whether they were privileged information and whether there was sufficient evidentiary basis for their production, see United States v. Iozia, 13 F.R.D. 335 (S.D.N.Y.1952), having inspected these reports, we find no prejudice to the defendant by virtue of their non-disclosure. The direct testimony by Smith on this phase of the case is not specific as to dates, but described events only as having occurred early or late in May and June. The surveillance was directed primarily at the activities of Petillo, and was in no way comprehensive enough in coverage either as to time or area to be of any value to Mirra for impeachment purposes. Furthermore, to the extent that the reports place Mirra, Smith, Fernandez and Petillo in frequent company at Johnny's Keyboard and at Chickie James' Stable, they tend more to corroborate than to impeach the testimony of Smith.

■ Mirra finally contends that the court improperly denied his motion to suppress evidence allegedly obtained by illegal wiretaps. His claim is that the surveillance already discussed was the result of wiretaps by state authorities during the period from February to October, 1958. Judge Levet found on the first trial, after conducting an extensive *voir dire*, that there was no indication that information obtained from the taps was transmitted to federal agents. The only federal participation alleged by Mirra is the fact that narcotics agent Rowan was shown the contents of the reports which he used when he subsequently questioned Smith in January, 1960. As Smith had already become an undercover employee of the Narcotics Bureau well before his contact with Rowan, these state wiretaps did not bear any relationship to the evidence secured by the federal government against Mirra.

E. *Mancino*

■ Appellant Mancino also asserts several claims of prejudicial error at the trial. At the time of the negotiations by Smith and Biase to set up a new outlet for narcotics supplied by Cotroni, Cotroni indicated that objections to this new outlet were being raised by some of his New York people, one of whom he indicated to be Mancino. Cotroni also stated that at one time he had considered Mancino to be a "good man", but that Mancino was on his way down, and the only reason Mancino was good was that he knew all the right people. Mancino contends that these statements were hearsay declarations outside his presence, and were inadmissible because in furtherance of a separate conspiracy in

direct conflict with the one charged in the indictment. It is quite true that Cotroni indicated to Smith and Biase that they would be taking $150,000 to $200,000 worth of business from some of these other people, but even if so, a new outlet would be a transfer rather than a conflict with the old conspiracy. A conspiracy, once established, is presumed to continue until the contrary is demonstrated and, as we said earlier, a conspiracy of this kind by its very nature is constantly expanding. There is no indication that Cotroni had any intention of totally severing his supply lines to his other outlets in New York City, including Mancino. While certain of Cotroni's remarks, such as statements to the effect that Mancino used to be a good man, might be considered as inadmissible because purely narrative in character, see United States v. Goodman, 129 F.2d 1009 (2d Cir. 1942), others clearly were not, see United States v. Tarricone, 242 F.2d 555 (2d Cir. 1957), and any error in admitting the purely narrative declarations was harmless in view of the overwhelming evidence of Mancino's participation. Fed.R.Crim.P. 52(a).

■■■ Mancino complains of the refusal by the trial judge to permit the admission of the first trial testimony of Mrs. Susini, the wife of a Parisian attorney. Smith had testified that at the Montreal meeting in April or May of 1957 which Mancino had attended, he met "Pepe" Cotroni as he was leaving the meeting. Cotroni's wife testified that her husband left for Paris in March, 1957, and she did not see him again until May 12, 1957, in Paris. Mrs. Susini had testified at the first trial to seeing Cotroni in Paris on May 5, 1957, and frequently thereafter during the remainder of the month. On a *voir dire*, the defense sought to establish that Mrs. Susini was unavailable on the second trial, thus justifying the use of her prior testimony. Having failed to do so by competent testimony Mancino's attorney requested permission to take her affidavit in Paris through his Paris

office. The Judge denied this request in his discretion on the grounds that it was both collateral and cumulative testimony. We agree that this was merely collateral impeaching material which it was within the Judge's discretion to reject. See McCormick, Evidence § 47 (1954).

In addition, Mancino claims that the Government on summation misquoted the record in belittling an alleged inconsistency, pointed out in defense counsel's closing, between Smith's testimony at the two trials. Mancino argues that the Judge's refusal to correct this misstatement constituted reversible error. Counsel attempts to denominate this inconsistency as "vital", but it is only one of many minor inconsistencies in Smith's testimony brought to the attention of the jury by the defense.

F. *Sciremammano*

■■■ Sciremammano contends that the indictment should have been quashed as to him because Smith made no mention in his Grand Jury testimony of Sciremammano by name. However, Smith did testify that he gave narcotics at the Squeez-Inn Bar to someone named Sal who had a club foot. This was sufficient identification of this defendant. As the Supreme Court in Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956) stated:

"If indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed. * * * An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits."

G. *Bentvena, Monastersky and Struzzieri*

The facts developed with respect to the purchase and delivery of heroin which involve Bentvena, Struzzieri and Monastersky constitute the proof which formed the basis of the prosecution's case against

them as charged in counts 4 and 5. On January 5, 1959, Agent Giorgio of the Bureau of Narcotics met appellant Monastersky on East 116th Street in Manhattan and on the following day ordered one-half kilogram of heroin from him for $6,000. Monastersky arranged for delivery that evening. During that evening, other agents of the Bureau of Narcotics followed Monastersky and saw him enter 525 East 88th Street. Several minutes later, a car driven by the defendant Marcantonio Orlandino entered the block. Struzzieri alighted from it and entered the same building carrying a package covered with blue and white Christmas wrapping paper. After some time he emerged empty-handed and drove off with Orlandino. Shortly thereafter Monastersky came out and drove out of the area. Later, the agents observed the co-conspirator, McGovern, come out of the building carrying a package of similar size and wrapping and followed him to 448 East 87th Street.

Later that evening, Agent Giorgio met Monastersky and was told by him that his partner had the "stuff". Monastersky took him to an apartment at 448 East 87th Street and introduced him to McGovern, who threw a package wrapped in blue and white Christmas wrapping paper on the table. Giorgio tested the contents and told Monastersky that it was "junk". The three men left the apartment and went downstairs where Giorgio handed McGovern $6,000 and McGovern gave the agent the narcotics. Another agent saw McGovern and Monastersky return to 525 East 88th Street where they met Struzzieri and Orlandino. Struzzieri and Orlandino left and were later overheard discussing Agent Giorgio's unwillingness to part with the money in advance of receiving the narcotics.

On January 13, 1959, Giorgio ordered more narcotics, agreeing to meet Monastersky that evening. They met and proceeded to 525 East 88th Street where they were told to return in an hour, Monastersky explaining to the agent that the "junk" wasn't there yet. Approximately 50 minutes later Bentvena and Struzzieri entered the building. Giorgio returned, accompanied by Agent Mangiaracina, who was introduced to Monastersky by Giorgio as his partner. While Mangiaracina waited in the lobby at 525 East 88th Street, Monastersky and Giorgio went to a second-floor apartment, passing Struzzieri and Bentvena on the way in. Giorgio, on being told by McGovern that these two were the delivery boys, asked McGovern to tell them not to become apprehensive of Mangiaracina, who was in the lobby, as he was Giorgio's partner. McGovern went to the housephone, spoke into it, and returned saying the junk would be there in a few minutes. Struzzieri and Bentvena walked to a car parked on 88th Street, opened the trunk, and removed a package which Bentvena tucked under his arm. Both men returned to McGovern's apartment, walking past Mangiaracina who was still in the lobby, and delivered the package to McGovern. The sale to Giorgio was then consummated.

In subsequent conversations between McGovern and Giorgio, McGovern discussed his overhead—$200 to Monastersky and $50 to the delivery boys. When, after numerous conversations between Giorgio, Monastersky and McGovern, agreement on the terms of future transactions could not be reached, negotiations were discontinued.

The evidence allegedly connecting Monastersky, Bentvena, and Struzzieri to the conspiracy consisted of (1) a glassine bag filled with narcotics seized from Marcantonio Orlandino evidencing a puncture sealed with an "X" in Scotch tape, (2) Orlandino's phone book containing a phone number alleged to be Tuminaro's, and (3) the hearsay remarks of Cotroni to Smith to the effect that the narcotics seized from Orlandino had belonged to "Bootsie" and "Angie" (Tuminaro and DePasqua) and had been supplied by Cotroni and that the "X" Scotch tape covering of the puncture was his trademark.

■■ Although it is clear that the hearsay declarations of a conspirator

are admissible against his co-conspirators if made pursuant to and in furtherance of the conspiracy, Clune v. United States, 159 U.S. 590, 593, 16 S.Ct. 125, 40 L.Ed. 269 (1895); Fiswick v. United States, 344 U.S. 604, 617–18 (1953), it is equally clear that there must be independent evidence establishing a defendant's participation in the conspiracy before such declarations are admissible against him. Glasser v. United States, 315 U.S. 60, 74–75, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Consolidated Laundries Corp., 291 F.2d 563, 576 (2d Cir. 1961); United States v. Stromberg, 268 F.2d 256, 265–67 (2d Cir. 1959). A defendant's "participation in the conspiracy which the Government sought to prove can be established only by proof, properly admitted into evidence, of their own words and deeds." United States v. Russano, 257 F.2d 712, 713 (2d Cir. 1958). Such independent proof must be substantial and not "too slight." United States v. Consolidated Laundries Corp., supra; United States v. Stromberg, supra.

 The Government's independent proof of participation fails to meet this standard and is tenuous at best. For the first time on appeal, the Government places primary reliance on the so-called Cotroni trademark found on the narcotics seized from Orlandino. Assuming *arguendo* that a Cotroni trademark was sufficiently established, nevertheless, that finding would have to be bottomed solely on the hearsay remarks of Cotroni. No independent evidence admissible against these defendants establishes the existence of such a trademark. In fact, the sole independent evidence available to connect these defendants with the conspiracy is the presence of the phone number, alleged to be Tuminaro's, in Orlandino's phone book. To find this to be of significance would be tantamount to holding that the mere association of conspirators is sufficient basis for a finding of participation. This notion we have already explicitly rejected. United States v. Stromberg, supra, 268 F.2d at 267. The Cotroni hearsay thus being inadmissible against them,

the Government failed to prove these defendants' participation in the overall conspiracy, and their conspiracy convictions must be reversed. My colleagues, however, believe that the joinder of the substantive and conspiracy counts against Bentvena, Monastersky and Struzzieri with the conspiracy count against the other defendants was so prejudicial as to also require reversal of their convictions on substantive counts 4 and 5. Therefore, the balance of this opinion expresses my dissent from the views set forth in the opinion of Judge Smith.

Struzzieri, Monastersky, and Bentvena contend, and the majority agree, that reversal of their substantive convictions is required, first, because they were improperly joined in this indictment, second, because they were tried in this mass conspiracy trial and, third, because evidence, particularly hearsay evidence, was admitted under the conspiracy count and the court failed to adequately instruct the jury that such evidence could not be used to convict under the substantive counts. In my opinion, the decision of the majority adopting these arguments represents a radical departure from the practice heretofore sanctioned in this circuit and elsewhere and may, in my view, effectively bar any joinder of substantive and conspiracy counts in criminal prosecutions.

Turning to the first contention of appellants—improper joinder, it is settled that failure of the prosecution to present sufficient independent evidence of the participation of these three defendants in the conspiracy charged does not require the conclusion that the indictment was improperly obtained *ab initio* or that the conspiracy and substantive counts were improperly joined. Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1959). An indictment merely contains the charges which the prosecution hopes to prove—a platitude dinned into the ears and minds of the jurors throughout the trial. To anyone familiar with the courtroom scene, the cases are legion in which defendants are

convicted on some counts, acquitted on others, cleared of conspiracy, convicted on substantive counts, and vice-versa. Witnesses to support the indictment may or may not be available or they may change their stories upon the trial. Alibi witnesses may suddenly appear to refute the Government's witnesses. In other words, the mere fact that the Government fails as to one or more counts does not mean that the indictment was improperly obtained or secured in bad faith. These should be elementary truisms.

The next asserted ground for reversal —that these three appellants were prejudiced by being tried in this mass conspiracy trial, is articulated by the majority as concern over the fact that they were "forced to sit through months of testimony establishing the conspiracy, none of which related to the substantive accusations." Much of what has just been said as to joinder is applicable here. Since these appellants were properly joined in this indictment, it is difficult to understand why they should not have been tried under it. Determination of whether there was sufficient proof to implicate them in the conspiracy had to await the end of the case. If, at that point, the trial judge, the jury or (later) an appellate court finds that the prosecution has not proved its case on the conspiracy count, the defendants are not, solely because they have been forced to sit through a long trial, entitled to the bonus of acquittal or reversal on the substantive counts which the government has proved.

The critical inquiry here is whether severance was required because of possible prejudice arising from the joinder of these three appellants with the other defendants. Schaffer v. United States, supra. A realistic approach to this question requires consideration of the nature of the narcotics conspiracy itself and a review of some recent decisions of this Court.

Investigation of a narcotics ring usually has its origin in a sale or series of sales made to narcotics or undercover agents. The salesmen, however, are as a rule on the outer fringe—the lowest echelon in the hierarchy of narcotics rings. Note, in passing, the "delivery boy" status ascribed to Bentvena and Struzzieri who for $25 apiece were in actual possession of a commodity retailing at $6,000 a half kilo. Quite frequently, the ringleaders or overlords of the narcotics business do not stultify themselves by possession when handlers can be so cheaply hired. Therefore, in an effort to bring a modicum of reality into the picture, the courts in the absence of Congressional action have had to create the doctrine of constructive possession or control. But the Government has learned that the occasional arrests of mere sellers will not seriously impede the drug flow. It is necessary, if possible, to apprehend those who are in charge of importation, wholesaling and retailing. Thus, when one of these major narcotics conspiracies is brought to trial, the number of defendants is usually large and the facts complex.

The character of some of the multi-defendant narcotic trials of importance brought in the federal courts in New York within the last five years illustrates the above quite vividly. In United States v. Stromberg, supra, there were 46 defendants and 16 others charged in a single conspiracy count. Of this number, 19 were tried together. The trial court directed a verdict of acquittal as to one, the jury convicted 18. On appeal, this court examined the record to determine whether there was sufficient independent evidence to sustain the conviction of each defendant. As to three defendants, this court found the evidence too slight to have been submitted to the jury and reversed and remanded with directions to dismiss. The "mass trial" arguments were rejected, the court finding that "nothing in the issues, the evidence or the rulings warrants a conclusion that the number of the defendants prevented the jury from appraising the independent evidence against each defendant and meting out individual justice under the law." 268 F.2d at 264.

In United States v. Aviles, supra, 37 defendants and 14 co-conspirators were named in the indictment. 17 stood trial, one was acquitted by the court, one by the jury, and the balance were convicted. Again, this court reviewed the record to determine whether there was sufficient evidence of knowing participation of each defendant in the conspiracy to warrant submission of the case as to him to the jury. As to one defendant, the court held that there was no such evidence and directed dismissal of the indictment as to him. The mass trial argument advanced was rejected and the convictions of 16 defendants were affirmed.

In United States v. Agueci, supra, the indictment contained 30 counts, the first count charged conspiracy, the remaining twenty-nine counts charged various defendants with substantive violations. There were 19 named defendants and 8 co-conspirators. 11 were convicted, 10 appealed. Several appellants contended that although the indictment charged one continuing conspiracy, the proof actually revealed several separate and independent conspiracies and that the prejudicial effect thereof required reversal. However, this court held that, even had there been several conspiracies, they could have been consolidated for trial. Furthermore, we said that "the conduct of the trial was such that the danger resulting from the admission of evidence not chargeable to any appellant was minimal." 310 F.2d at 827.

In each of those cases, some defendants had to sit through a lengthy trial after all the evidence relating to them had been introduced or had to patiently await the evidence that implicated them. This is inherent in the very nature of the case being tried. The courts have long recognized that narcotics conspiracies require a functional division of labor. A pusher may be the subject of the testimony of a single witness who might be called on the first or last day of trial. So, too, the "executive" has to sit through testimony relating only to minor sales about which he may know nothing.

This has never been considered by this court to be so prejudicial as to require severance or reversal by an appellate court when severance was refused. This prejudice, if it be such, would also exist if the jury found the defendants not guilty on the conspiracy count but guilty on substantive counts.

Struzzieri, Monastersky and Bentvena contend, and the majority agree, that evidence, particularly hearsay evidence, was admitted under the conspiracy count and that the court failed to adequately instruct the jury that such evidence could not be used to convict under the substantive counts. Appellants point to Cotroni's statement that the Orlandino "junk" was his; to McGovern's statement that Struzzieri and Bentvena were his delivery boys; and to an entry in a telephone book belonging to Orlandino containing the name "Ang. Tumanaro", an address and a phone number. The validity of these contentions can be resolved only from the charge itself.

The court dealt with each count separately and instructed the jury that each count of the indictment must be considered separately and that the guilt or innocence of each defendant referred to in that count must be determined separately. After Count 4 (Struzzieri and Monastersky) was read in its entirety, the court summarized the evidence to be considered by the jury in deciding whether the defendants charged therein were guilty or innocent. The summary of proof necessary for "The government, to establish the first essential element against Struzzieri and Monastersky" encompassed primarily the testimony of two narcotics agents concerning the events of January 5 and 6, 1959, including the meeting with Monastersky and McGovern, the order from the Agent to Monastersky for one-half kilo for $6,000, Struzzieri's carrying the package and payment and delivery. The defense testimony was also summarized. Struzzieri, testifying in his own defense, claimed the package contained a shirt, not heroin. Monastersky also testified that the discussions with the agents re-

lated to the organization of a crap and blackjack game and that the cash was the amount the agent had available to invest in the game. No reference was made to any of the facts (later summarized by the court in dealing with count 8 and developed largely through the witness Smith who did not testify as to any of the facts involved in the substantive counts) upon which the conspiracy was based or to the "delivery boy" hearsay by McGovern or to the Cotroni, Orlandino hearsay. In short, the evidence controlling guilt or innocence under this substantive count was limited to the events actually observed or clearly admissible conversations.

The court's summary as to Count 5 was also limited to the events of January 13, 1959, and covered the testimony of three agents who described the order to Monastersky for another half kilo at $6,000, the activities of Bentvena, Struzzieri and McGovern, and the delivery of, and payment for, the heroin. Struzzieri, testifying in his own defense, claimed that the package which Bentvena took out of a car contained betting slips, not heroin. No conspiracy proof was mentioned as applying to this count.

Although there was no direct evidence that Monastersky had actual physical possession of the packages involved in the transactions of January 6 and 13, there is ample evidence upon which a conclusion of constructive possession or control can be based. Similarly as to Struzzieri, he may not have physically handled the package on January 13, 1959, but the proof was sufficient to warrant a finding of constructive possession or control.

The court's instructions to the jury properly defined the elements entering into constructive possession and control, and related them to the actual proof presented. The court adverted to no testimony as to events subsequent to the middle of January, 1959, or which were developed as part of the proof introduced to establish the conspiracy.

In contrast to the evidence summarized as to the specific sales of January 6th and 13th, 1959 (the substantive counts), the court's treatment of the conspiracy count was entirely different. After count 8 had been read, the court separately reviewed the conspiracy testimony, commencing with the Montreal meeting in April or May, 1957, attended by many of the defendants and including the various importations from Canada to New York and the distribution of the heroin to the several outlets in New York and Brooklyn. Only to connect Monastersky, Struzzieri and Bentvena to the conspiracy were the hearsay "delivery boys" and "Cotroni" conversations referred to. Thus, the court was diligent in keeping the many items of proof confined to the counts to which they related.

The fear expressed by these three appellants that the jury, in convicting them on the substantive counts, may have been influenced by proof tendered to establish the conspiracy count is belied by the jury deliberation itself.

Soon after the jury began its deliberations, they requested that the testimony regarding the Bentvena-Struzzieri-Monastersky sales of narcotics be read, along with the instructions on these substantive counts. Also requested were all the exhibits on the first substantive count, count 4, and an index of all exhibits received in evidence. The jury was brought in and asked to be more specific on the first three of these requests. A few minutes later the jury returned a note specifying those parts of Agent Giorgio's testimony regarding the January 6, 1959, transaction that were desired. Shortly after this testimony was read, the exhibits on count 5 were requested. Further requests by the jury related only to the conspiracy count. It seems clear that the jury, during its five days of deliberation, considered each count separately and, in considering the substantive counts, used only the evidence that had been marshalled by the judge in his charge on the substantive counts. As noted above, none of the hearsay declarations were included in this summary.

Despite the instructions given, the careful marshaling of the evidence, and the jury deliberations, the majority "cannot feel confident" that the hearsay declarations did not contribute to the convictions on the substantive counts. Again, I must voice my view that this is simply unrealistic. The error which causes reversal of the conspiracy convictions of these three appellants was the failure to connect them to the conspiracy except through evidence we now hold to have been inadmissible. But this evidence did not relate to the substantive counts in any manner whatsoever. This my colleagues virtually concede in saying, "The week of proof at the beginning of the trial relating to these three was practically the only reference to them. Thereafter, the trial was solely concerned with proof of guilt in the conspiracy." From this they conclude that "no prejudice to the other defendants resulted from their trial with the three substantive-count defendants", the reason given being that "It is unlikely that this would confuse jury deliberations." However, if the jury were not confused by the separate conspiracy phase, why would it have been prejudicially confused by the equally separate substantive phase.

If the possibility of confusion is to be our concern, it would be well to consider the confusion that will now surround prosecutors and trial judges as a result of the majority decision. Consider some of the possibilities inherent in the usual multi-defendant narcotics trial. Somewhere amongst the defendants will be one or more who, the prosecutor charges, have actually made sales of narcotics and who are also part of the conspiracy. If the jury acquits them on the conspiracy count but convicts on the substantive count, how can any appellate court "feel confident" that hearsay evidence received solely on the conspiracy count might not have been a prejudicial factor in the conviction on the substantive count. The same situation is presented if tainted evidence is received on the substantive counts and the jury brings in a verdict

of guilt only on the conspiracy count. The same will be true if only substantive counts are charged and evidence is erroneously admitted as to one count on which the jury finds the defendant not guilty. There can be no logical distinction drawn between these situations and the situation before us where an appellate court, instead of a trial judge or a jury, finds that conviction on one count, as to which tainted evidence was received, was not warranted. Upon appellate review how can we ever "feel confident" that a jury in convicting did not rely upon some answer given before objection taken and subsequently stricken or upon something said by court or counsel despite instructions to ignore such remarks. Any argument to the effect that such a possibility is less likely when the jury brings in a verdict of not guilty on the unproven count because the jury probably discredited such evidence or because such evidence was not related to the other counts is pure speculation. The jury may have fully credited such evidence but found that guilt was not proved beyond a reasonable doubt.

If a feeling of confidence is to be our standard, we should forbid the joinder of counts in one indictment. Appellate courts have never found this course necessary, however, because they have followed the rule that testimony related to counts on which there was an acquittal is not harmful even if it was improperly admitted at trial. Thus, courts have consistently held that if there was sufficient evidence to support conviction on one count, errors relating to other counts will not be reviewed if the sentences are to run concurrently. See, e. g., Lawn v. United States, 355 U.S. 339, 362, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Sinclair c. United States, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692 (1929); Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1794 (1943); Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); United States v. Mont, 306 F.2d 412 (2d Cir. 1962); Blassingame v. United States, 254 F.2d 309 (9th Cir. 1958);

Thomas v. United States, 93 U.S.App. D.C. 392, 211 F.2d 45 (D.C.Cir.) cert. denied, 347 U.S. 969, 74 S.Ct. 780, 98 L. Ed. 1110 (1954); Miranda v. United States, 196 F.2d 408 (9th Cir.) cert. denied, 344 U.S. 842, 73 S.Ct. 55, 97 L. Ed. 655 (1952); Gibson v. United States, 80 U.S.App.D.C. 81, 149 F.2d 381 (D.C. Cir.), cert. denied, 326 U.S. 724, 66 S.Ct. 29, 90 L.Ed. 429 (1945). And this has been the practice even when an appellant contended that there was insufficient evidence to convict him on a conspiracy count if the court found that his substantive conviction was warranted by the record. See United States v. Agueci, supra; United States v. Cardillo, 2d Cir., 316 F.2d 606.

I feel that in cases where the conspiracy count is dismissed at the close of the prosecution's case by the trial judge, or where the jury returns a verdict of not guilty on the conspiracy count, or where an appellate court reverses a conviction on the conspiracy count, we should follow the standards applied by Judge Medina in United States v. Schaffer, 266 F.2d 435 (2d Cir.), aff'd, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1959). There it was found that no prejudice existed, first, because instructions were given on every offer of proof that evidence admitted with respect to one defendant was not to be considered with respect to any other defendant. Second, the witnesses were called in orderly fashion so that each group of witnesses focused on a separate defendant. Third, the court's charge carefully reviewed the evidence pro and con with respect to each defendant, and an admonition was given to keep the charges separate and to consider the evidence against each defendant separately. Each of these safeguards against adverse prejudice is satisfied here. In addition, the court charged the jury in the exact language approved by the Supreme Court in Blumenthal v. United States, 332 U.S. 539, 559–60, 68 S.Ct. 248, 92 L.Ed. 154 (1947), namely, that "the guilt or innocence of each defendant must be determined by the jury separately. Each defendant has the same right to that kind of consideration on your part as if he were being tried alone." Thus, in view of the more than adequate evidence of guilt on the substantive counts, I would affirm those convictions.

The other appellants also seek to take advantage of this joinder, claiming prejudice by being tried with the Orlandino phase defendants. This effort must fail, however, because all of the evidence introduced at trial was properly admissible against these appellants. There was sufficient independent evidence to link these appellants to Cotroni as members of the same conspiracy. The Cotroni statements to Smith and Biase concerning Orlandino were thus binding on these appellants and were sufficient to make the Orlandino phase defendants their co-conspirators in one over-all conspiracy. The fact that there was insufficient independent evidence to make the Cotroni statements binding on the Orlandino phase defendants does not change this result. The situation presented is that the Government proved the existence of one overall conspiracy but failed to present sufficient independent evidence to make the Cotroni statements admissible against Bentvena, Monastersky and Struzzieri. Since they were their co-conspirators, the other appellants cannot claim error in the introduction of evidence relating to the Orlandino phase defendants, or prejudice in being tried with them.

We wish to express our special thanks and gratitude to Constantine N. Katsoris, Esq., and William R. Luney, Esq., who acted as assigned counsel, both at trial and on appeal, and to Richard V. Giordano, Esq., who acted as assigned counsel on appeal. The trial of this case was long and arduous and preparation of the appeal required the reading of the 25,000-page record of both trials. The devotion and skill demonstrated by these attorneys casts credit upon them. Their briefs and oral arguments conformed to the highest standards of the profession.

The convictions of Bentvena, Monastersky and Struzzieri on the substantive

and conspiracy counts are reversed, and the substantive counts are remanded for a new trial; the conviction of Salvatore Panico on the conspiracy count is reversed and remanded for a new trial; the convictions of all other appellants are affirmed.

SMITH, Circuit Judge, with whom HAYS, Circuit Judge, joins, concurring in part:

 Judge Hays and I agree with the careful and exhaustive opinion of our brother Moore except in one respect, the affirmance of the convictions on the substantive counts, 4 and 5.

The trial of Bentvena, Struzzieri and Monastersky together with those indicted and tried only for conspiracy under the circumstances here portrayed, we feel, constituted prejudicial error as to them. The proof of their participation in the transactions alleged in the substantive counts was presented at the start of the government's case. Thereafter, they and the jury were forced to sit through months of testimony establishing the conspiracy, none of which related to the substantive accusations. We cannot feel confident that the admission of this evidence against them, when it was legally inadmissible unless they were shown to be part of the conspiracy, did not contribute to their convictions on the substantive counts by blackening them with the general guilt. See Schaffer v. United States, 362 U.S. 519, 523, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960) (dissenting opinion).

This is not a case like Schaffer v. United States, supra, or United States v. Manfredi, 275 F.2d 588 (2 Cir. 1960), in which the dismissal of a conspiracy count as to less than all defendants during trial was held not to prevent submission to the jury of substantive counts against these defendants. (It may be noted that even in Schaffer four judges dissented.) Proper cautionary instructions there can presumably limit the prejudicial effect of the evidence presented at the trial directed towards proof of the conspiracy. Indeed, one might speculate that a jury would scrutinize evidence of substantive guilt with greater than ordinary care once apprised of the fact that the government had failed to prove its conspiracy case against a particular defendant. But in the case at bar there were no limiting instructions to disregard evidence concerning these defendants. All counts were submitted to the jury, which found defendants guilty of conspiracy on evidence that we have unanimously held to be legally insufficient, and then considered the mass of hearsay declarations of purported co-conspirators against them. There appears to us far greater likelihood of prejudice here than in a case where the jury has weighed the evidence of conspiracy and found it wanting, or where the Court has so found and warned the jury to disregard it.

Particular evidence of prejudice can readily be found. Struzzieri and Monastersky both took the stand and denied dealing in narcotics. Though admitting their physical presence in the area and certain details as to their physical movements, they claimed that their activities and those of Bentvena related to gambling transactions. Struzzieri's testimony to fourteen or fifteen bookmaking arrests (supported by police testimony) lends a certain wry corroboration to his story. Both Bentvena and Struzzieri were brothers-in-law of the severed defendant McGovern, who figured prominently in the alleged substantive violations. The package wrapped in Christmas paper was said to be a present to him. From these and other details, the three sought to explain the activities in which they were observed on some basis other than dealing in narcotics. We may be skeptical, but it is not our primary function to appraise this evidence. The jury charged with that duty could hardly have given their defense the same consideration after they were erroneously found to be narcotics conspirators as it would have had they been tried on the substantive counts alone. The mass of conspiracy evidence militated against their credibility and towards their guilt.

Nor do we overlook the general prejudice that results to unrelated defendants who are tried in a mass conspiracy trial. We need but quote Kotteakos v. United States, 328 U.S. 750, 772–773, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946):

"Numbers are vitally important in trial, especially in criminal matters. Guilt with us remains individual and personal, even as respects conspiracies. It is not a matter of mass application. There are times when of necessity, because of the nature and scope of the particular federation, large numbers of persons taking part must be tried together or perhaps not at all, at any rate as respects some. When many conspire, they invite mass trial by their conduct. Even so, the proceedings are exceptional to our tradition and call for the use of every safeguard to individualize each defendant in his relation to the mass. Wholly different is it with those who join together with only a few, though many others may be doing the same and though some of them may line up with more than one group.

"Criminal they may be, but it is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Nor does our system tolerate it. That way lies the drift towards totalitarian institutions. True, this may be inconvenient for prosecution. But our Government is not one of mere convenience or efficiency. It too has a stake, with every citizen, in his being afforded our historic individual protections, including those surrounding criminal trials. About them we dare not become careless or complacent when that fashion has become rampant over the earth."

However, we find that no prejudice to the other defendants resulted from their trial with the three substantive-count defendants. The week of proof at the beginning of the trial relating to these three was practically the only reference to them. Thereafter, the trial was solely concerned with proof of guilt in the conspiracy. It is unlikely that this would confuse jury deliberations. Moreover, all of the direct evidence of their participation in the conspiracy was properly admitted against the conspiracy defendants. These appellants attack so-called "real evidence" (narcotics and paraphernalia) which was admitted—particularly that allegedly purchased from the three which they claim to be inadmissible against the conspiracy defendants on the record before us. Once they were linked to the conspiracy by independent evidence this appears properly admissible against them. Moreover, this was of itself of no particular force to prove participation in the conspiracy by any individual. It was merely duplicative of other like evidence seized from co-conspirators which was properly admitted. Even if there were error in the admission of any of this evidence we could not hold it prejudicial.